2005 ME 106

**STATE of Maine**

v.

**Jason BOUCHARD.**

Supreme Judicial Court of Maine.

Argued: Oct. 19, 2004.
Decided: Sept. 8, 2005.

G. Steven Rowe, Attorney General, Leanne Robbin, Asst. Atty. Gen. (orally), Augusta, for State.

Peter B. Bickerman, Esq. (orally), Verrill Dana LLP, Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, and LEVY, JJ.*

CLIFFORD, J.

[¶ 1] Jason Bouchard appeals from judgments of conviction for theft by deception (Class C), 17–A M.R.S.A. § 354 (Supp. 2004); theft by unauthorized taking or transfer (Class B), 17–A M.R.S.A. § 353 (Supp.2004); and misuse of entrusted property (Class D), 17–A M.R.S.A. § 903 (1983), entered in the Superior Court (Penobscot County, *Mead, J.*) following a jury trial. Bouchard contends that there is insufficient evidence to support each of his convictions, and also asserts that the court erred or acted beyond its discretion (1) by failing to merge two of the counts, (2) in the way it instructed the jury, (3) by excluding certain evidence at trial, and (4) in the sentence it imposed on him. We affirm the judgment.

## I. BACKGROUND

[¶ 2] Viewed in a light most favorable to the State, *see State v. Turner*, 2001 ME 44, ¶ 6, 766 A.2d 1025, 1027, the following facts are supported by the record. Bouchard was a warden pilot for the Maine Warden Service stationed out of the Lincoln Airport in Lincoln. In the performance of his duties, Bouchard regularly operated a State aircraft for which he was permitted to purchase fuel. As a warden pilot, Bouchard could refuel his State aircraft at any one of various aircraft fuel businesses around the State without paying at the time of refueling, and the fuel business would then bill the State directly.

[¶ 3] Bouchard was the sole owner of an aviation fuel business known as Riverside Fuel, located at the Lincoln Airport. When Bouchard disclosed his interest in Riverside Fuel to his supervisors at the Warden Service, his supervisors instructed him not to buy fuel for his State aircraft

* Justice Paul L. Rudman participated in the initial conference, but retired before this opinion was certified.

from Riverside Fuel because that would constitute a conflict of interest in violation of State law. Nevertheless, Bouchard began purchasing fuel for his State aircraft from Riverside Fuel. Bouchard charged the State a retail price commensurate with the prices charged by other aircraft fuel suppliers in the State.

[¶ 4] Keith Strange was a friend of Bouchard's who owned and operated an aircraft maintenance and service business known as Riverside Aviation, also located at the Lincoln Airport. Riverside Aviation did not sell aviation fuel. For some time, Strange managed Bouchard's fuel pumps at Riverside Fuel, including the billing and accounting. During that time, invoices for the unauthorized fuel purchases made by Bouchard at Riverside Fuel for his State aircraft were sent to the State on the letterhead of Riverside Aviation. Thus, the fact that the fuel for Bouchard's State plane was actually being purchased from Riverside Fuel was concealed from State officials. The State paid the fuel invoices it received from Riverside Aviation, unaware that the fuel had actually been purchased at Riverside Fuel, and Riverside Aviation then issued corresponding checks to Bouchard. If the Warden Service had known that it was in fact purchasing fuel from Bouchard, it would not have authorized the purchases, nor paid the invoices. The theft by deception charge was based on Bouchard's acts of deceiving the State into paying for purchases of fuel for his State plane from his own business in violation of Warden Service orders.

[¶ 5] Bouchard later told his supervisors that he had sold his entire interest in Riverside Fuel to Forrest Dudley. Dudley was another friend of Bouchard's who owned a garage and fuel station known as Dudley Citgo. Although Dudley and Bouchard had discussed a sale of Riverside Fuel to Dudley, Dudley never in fact purchased or maintained any interest in Bouchard's aviation fuel business.

[¶ 6] Bouchard was also issued a State fuel credit card to facilitate the purchase of fuel for his State aircraft. A warden pilot using a State fuel credit card to obtain fuel would present the card to the proprietor of a fuel business, the proprietor would bill the State directly for the fuel purchase, and the State would then pay the credit card invoice directly to the proprietor.

[¶ 7] At some point, Bouchard began using his State fuel credit card to obtain cash without authorization. It was for these acts that Bouchard was charged with theft by unauthorized taking, and with misuse of entrusted property. Bouchard would present his card at Dudley Citgo, which did not sell aviation fuel. Dudley Citgo would then bill the State for an aviation fuel purchase ostensibly made by Bouchard, but that in fact was not made. When the State paid the invoice to Dudley Citgo, Dudley would then issue that amount back to Bouchard in cash. Corresponding cash deposits were made into Bouchard's personal bank account.

[¶ 8] Bouchard's charges on his State fuel credit card totaled $14,631.75. During the time that Bouchard was using his State fuel credit card to obtain cash, he was also making legitimate fuel purchases for his State aircraft from locations other than Dudley Citgo. The value of the amount of fuel Bouchard actually used in his State aircraft for State business during this period was less than the $14,631.75 charged to his State fuel credit card. Thus, some portion of the $14,631.75 charged to his State fuel card could not have been used for legitimate fuel purchases. The State paid the fuel invoices it received from Dudley Citgo, but would not have done so had it known that the invoices did not represent actual fuel sales, and that Bouchard

was instead using the State fuel credit card to obtain cash.

[¶ 9] Bouchard was charged with one count each of theft by deception (Class C), 17–A M.R.S.A. § 354; theft by unauthorized taking or transfer (Class B), 17–A M.R.S.A. § 353; and misuse of entrusted property (Class D), 17–A M.R.S.A. § 903. Following a jury verdict, Bouchard was convicted on all three counts and sentenced to nine months incarceration for the two counts of theft, with all but twelve days suspended, and five days incarceration for the misuse of entrusted property count, to be served concurrently. He was also placed on probation for four years, with a condition of probation being that Bouchard make restitution to the State in an amount up to the $14,631.75 in cash he obtained from the use of his State fuel credit card. Bouchard's appeal followed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

[¶ 10] Bouchard challenges the sufficiency of the evidence as to each of his three convictions. In reviewing a challenge to the sufficiency of the evidence in a criminal matter, we view the evidence "in the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged." *Turner*, 2001 ME 44, ¶ 6, 766 A.2d at 1027 (quotation marks omitted). Further, the fact-finder may "draw all reasonable inferences from the evidence." *State v. Michaud*, 1998 ME 251, ¶ 11, 724 A.2d 1222, 1228 (quotation marks omitted).

### 1. Theft By Deception

[¶ 11] "A person is guilty of theft if ... [t]he person obtains or exercises control over property of another as a result of deception and with intent to deprive the

other person of the property." 17–A M.R.S.A. § 354; *see also State v. Maier*, 423 A.2d 235, 240 n. 7 (Me.1980). The charge of theft by deception resulted from Bouchard's acts in arranging for the State's purchase of fuel from Bouchard's own business contrary to his supervisors' instructions. Bouchard contends that because he charged the State a fair market value for the fuel, and because the State would have purchased the exact same amount of fuel at the exact same times, the State suffered no resulting deprivation as a result of his acts of deception, and therefore there was no theft. We disagree.

[¶ 12] Section 354 contains no requirement that the victim of a theft by deception suffer any pecuniary loss as a result of the defendant's actions, and we will not read that requirement into the statute. The Criminal Code instructs that an "[i]ntent to deprive" includes, among other things, an intent "[t]o use or dispose of the property under circumstances that make it unlikely that the owner will recover it." 17–A M.R.S.A. § 352(3)(C) (1983). Thus, a theft is committed when the actor deprives an owner of the control or use of the owner's property, regardless of whether, in the end, the owner suffered a resulting financial loss. Here, the State suffered a deprivation because, by Bouchard's deceptive acts, it lost control over *to whom* its money was paid, even though the money paid was used to purchase goods the State needed and otherwise would have purchased.

[¶ 13] The Criminal Code denominates "theft" as constituting "a single crime embracing the separate crimes such as those heretofore known as larceny, larceny by trick, larceny by bailee, embezzlement, *false pretenses*, extortion, blackmail, shoplifting and receiving stolen property." 17–A M.R.S.A. § 351 (1983) (emphasis added). "[I]t is generally held that the

lack of financial loss is no defense to false pretenses." 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 19.7(i)(3) (2d ed.2003). This view is expressly adopted in subsection (3) of section 354, which states: "It is not a defense to a prosecution under this section that the deception related to a matter that was of no pecuniary significance ...." 17–A M.R.S.A. § 354(3). The absence of a pecuniary loss is not a defense to a charge of theft, and proof of a pecuniary loss is not an element of the crime of theft by deception. It is the nature of the deception, not the presence or absence of a substantial pecuniary loss, that is the operative inquiry in a theft case.

[¶ 14] The evidence presented at trial showed that Bouchard misled his supervisors at the Warden Service into believing that he had no interest in Riverside Fuel, when in fact he did. As a result, the State paid for fuel from a source to which it would not have agreed but for Bouchard's deception. As the trial court explained in denying Bouchard's motion for a judgment of acquittal:

> The Defendant's argument, taken to the extreme, would decriminalize the unauthorized taking of property as long as the thief substituted other property of equal value. The law of property provides that the owner of property has the sole and exclusive dominion over it. Any unauthorized taking constitutes theft. A taking under the guise of material misrepresentation constitutes the offense of Theft by Deception.

We affirm Bouchard's conviction for theft by deception.

 2. Theft By Unauthorized Taking or Transfer

[¶ 15] The charge of theft by unauthorized taking or transfer was based on Bouchard's use of the State fuel credit card to obtain cash. A conviction for theft by unauthorized taking or transfer is supported by evidence that the defendant: "(1) obtained or exercised unauthorized control (2) over the property of another (3) with intent to deprive the owner of that property." *State v. Willette*, 2002 ME 165, ¶ 8, 809 A.2d 617, 620; *see also* 17–A M.R.S.A. § 353. Because Bouchard charged $14,631.75 to the State fuel card, he was charged with the theft as a Class B offense.[1] *See* 17–A M.R.S.A. § 353(B)(1).

[¶ 16] The evidence showed that Bouchard used his State fuel credit card to obtain cash from Dudley Citgo, a business that did not sell aviation fuel. Bouchard intended to, and did, obtain cash in an amount exceeding $10,000 from State funds contrary to the purpose for which the card was issued to him. Viewed in the light most favorable to the State, that evidence supports a finding beyond a reasonable doubt as to each of the elements of theft by unauthorized taking or transfer.

[¶ 17] During the time that he was improperly obtaining cash with his State fuel card, Bouchard contends that he was also using some portion of that money to reimburse himself for prior legitimate fuel purchases. Nevertheless, the $14,631.75 charged to the State fuel credit card exceeded the value of the fuel Bouchard actually used during that period. Thus, although Bouchard asserts that he used some of the $14,631.75 charged on the State fuel card to reimburse himself for authorized fuel purchases, not all of the $14,631.75 could have gone for such purchases.

[¶ 18] Bouchard contends that because the evidence showed that at least some

**1.** "[If t]he value of the property is more than $10,000[, v]iolation of this subparagraph is a

Class B crime ...." 17–A M.R.S.A. § 353(B)(1) (Supp.2004).

portion of the money obtained by the fuel card was used for the legitimate purpose of paying for previously-made authorized fuel purchases, the State failed to prove that he committed the theft in an amount exceeding $10,000, and therefore that he was erroneously convicted of Class B theft. We are unpersuaded by Bouchard's argument. The unauthorized control and deprivation to the State occurred when the cash was improperly obtained. The fact that Bouchard may have subsequently used some portion of the cash he obtained to make an otherwise legitimate purchase of fuel or to reimburse himself for such a purchase does not change the fact that Bouchard took more than $10,000 in an unauthorized manner as prohibited by section 353. *See State v. Kotredes,* 2003 ME 142, ¶¶ 5, 11–12, 838 A.2d 331, 333, 335 (concluding that sufficient evidence supported the defendant's conviction for theft for his unauthorized use of a town-issued credit card in his capacity as town manager to obtain personal cash advances and make personal purchases, even though some portion of the charges incurred on the card were made to reimburse himself for approved town-related expenses).

### 3. Misuse of Entrusted Property

 [¶ 19] Title 17–A M.R.S.A. § 903 provides:

A person is guilty of misuse of entrusted property if he deals with property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is a violation of his duty and which involves a substantial risk of loss to the owner or to a person for whose benefit the property was entrusted.

17–A M.R.S.A. § 903.

[¶ 20] The evidence showed that a State fuel credit card was entrusted to Bouchard as a warden pilot for use in purchasing approved fuel for State planes, that Bouchard knew he was not permitted to use the State fuel card to obtain cash for personal purposes, and that such impermissible use of the card resulted in Bouchard obtaining State funds. Such evidence supports a finding that the State suffered a substantial risk of loss, and is sufficient to support the jury's finding beyond a reasonable doubt that Bouchard committed each element of the crime of misuse of entrusted property.

### B. Sentencing

 [¶ 21] Bouchard was sentenced to nine months incarceration for the two counts of theft and five days for the misuse of property count, to be served concurrently, with all but twelve days suspended, as well as four years probation. A condition of Bouchard's probation was payment of *up to* $14,631.75 in restitution to the State. "Restitution may be authorized, in whole or in part, as compensation for economic loss." 17–A M.R.S.A. § 1325(1) (Supp.2004). "Economic loss" is defined as "economic detriment consisting of environmental clean-up expense, property loss, allowable expense, work loss, replacement services loss and, if injury causes death, dependent's economic loss and dependent's replacement services loss." 17–A M.R.S.A. § 1322(3) (Supp.2004).

[¶ 22] The amount of $14,631.75 represents the total amount charged by Bouchard on the State fuel credit card. Bouchard challenges that amount of restitution, again because of the lack of proof regarding what portion of the amount charged to the State fuel credit card went to legitimate fuel purchases and what portion went to personal use. Although the court's judgment uses the sum certain of $14,631.75 as a restitution amount, the sentencing order calls for restitution of *up to* $14,631.75, with the

exact amount to be determined by the Division of Probation and Parole. We therefore affirm the order of restitution, but we note that it remains for the Division of Probation and Parole to determine the actual amount that Bouchard should be required to pay in restitution, not to exceed $14,631.75. In making that determination, the probation officer should consider any evidence that may be offered by Bouchard as to how much of the $14,631.75 he used to reimburse himself for legitimate prior fuel purchases, purchases that would reduce the total amount of the State's economic loss, and thus the amount of restitution to be paid.

## C. Bouchard's Other Contentions

[¶ 23] Bouchard also contends that the court erred in instructing the jury, in excluding evidence, and in failing to merge the misuse of entrusted property count with the theft by unauthorized taking or transfer count. We conclude that each of these contentions is without merit.

### 1. Jury Instruction Regarding 5 M.R.S.A. § 18

[¶ 24] Bouchard argues that the court should not have instructed the jury regarding Maine's conflict of interest statute, 5 M.R.S.A. § 18, which provides:

An executive employee commits a civil violation if he personally and substantially participates in his official capacity in any proceeding in which, to his knowledge, any of the following have a direct and substantial financial interest:

A. Himself, his spouse or his dependent children;

B. His partners;

C. A person or organization with whom he is negotiating or has agreed to an arrangement concerning prospective employment;

D. An organization in which he has a direct and substantial financial interest; or

E. Any person with whom he has been associated as a partner or fellow shareholder in a professional service corporation . . . .

5 M.R.S.A. § 18(2) (2002 & Supp.2004).

[¶ 25] At the close of the evidence, the court instructed the jury as to the elements of each of the offenses with which Bouchard was charged, and then informed the jury as to the substance of section 18. Bouchard did not object to the court's instruction. Our review is therefore for obvious error. *See* M.R.Crim. P. 52(b); *State v. Small,* 2000 ME 182, ¶ 5, 763 A.2d 104, 105.

[¶ 26] The court accurately recited the provisions of the conflict of interest statute, and the information was helpful to the jury in understanding the context of various witnesses' testimony that Bouchard had violated State conflict of interest law. The court made clear that "[t]his [conflict of interest statute] isn't a charge pending against the defendant. This is simply some law as it exists on our books." It was not error, much less obvious error, for the court to inform the jury regarding section 18.

### 2. Jury Instruction Regarding Theft By Unauthorized Taking or Transfer

[¶ 27] Although Bouchard did not object to the court's jury instruction regarding theft by unauthorized taking or transfer, he contends on appeal that the court erred by omitting the word "unauthorized" in its recitation of the elements of the offense. We again review the instruction for obvious error affecting substantial rights. *See* M.R.Crim. P. 52(b); *Small,* 2000 ME 182, ¶ 5, 763 A.2d at 105.

[¶ 28] We review the jury instructions in their entirety "to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law." *State v. Lemieux,* 2001 ME 46, ¶ 2, 767 A.2d 295, 296 (quotation marks omitted). The substance of Bouchard's trial was his use of the State fuel credit card to obtain cash for unauthorized purposes. The entire trial was centered on whether Bouchard's use of the State credit card was authorized. When the jury instructions are viewed in their entirety, the omission of the word "unauthorized" from part of the jury instructions does not constitute obvious error.

3. Exclusion of Evidence

[¶ 29] Bouchard also contends that the court erred in excluding evidence about other game wardens who were also employees of, but had no ownership interest in, private businesses that did business with the State. Because such evidence had little or no relevance, but had a great potential to confuse the jury, the court acted well within its discretion in excluding such evidence. *See* M.R. Evid. 403; *Fitzgerald v. City of Bangor,* 1999 ME 50, ¶ 10, 726 A.2d 1253, 1255.

4. Merger

[¶ 30] Finally, because neither the relevant facts nor the elements as legally defined are the same for either charge, we find no merit to Bouchard's contention that the misuse of entrusted property charge should be merged into the charge of theft by unauthorized taking or transfer. *See* 17–A M.R.S.A. § 13–A (1983); *State v. Poulin,* 538 A.2d 278, 278 (Me.1988).

The entry is:

Judgment affirmed.