2007 ME 151

**STATE of Maine**

v.

**Lucien WOO.**

Supreme Judicial Court of Maine.

Argued: Oct. 19, 2007.
Decided: Dec. 20, 2007.

Neale T. Adams, Dist. Atty., Todd R. Collins, Asst. Dist. Atty. (orally), Caribou, for the State.

Verne Paradie (orally), Trafton & Matzen, Auburn, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, LEVY, MEAD, and GORMAN. JJ.

Dissent: ALEXANDER and SILVER, JJ.

GORMAN, J.

[¶ 1] Lucien Woo appeals a conviction entered in Superior Court (Aroostook County, *Hunter, J.*) for unlawful trafficking in scheduled drugs (Class B), 17–A M.R.S. § 1103(1–A)(A) (2006), following a jury trial. Although Woo raises several issues on appeal, we address only his contention that the evidence was not sufficient

to support the jury's guilty verdict.[1] We affirm the judgment.

## I. BACKGROUND

[¶ 2] On September 9, 2005, Woo was indicted on one count of unlawful trafficking in scheduled drugs (Class B), 17–A M.R.S. § 1103(1–A)(A), by a grand jury that found that "[o]n or about May 31, 2005, ... Lucien Woo did intentionally or knowingly traffick in what he knew or believed to be a scheduled drug, which was in fact Methamphetamine, a schedule W drug."

[¶ 3] On or about April 10, 2006, Woo was arrested on a second count of unlawful trafficking in scheduled drugs and one count of violating a condition of release. Jury selection for trial on the first indictment occurred on May 8, 2006. Woo was indicted on the second charge of unlawful trafficking in scheduled drugs on May 12, 2006. Woo's three-day trial with respect to the first indictment began on May 16, 2006. Woo was convicted of the charge of Class B unlawful trafficking in scheduled drugs and, on July 20, 2006, he was sentenced for that conviction. At the same time, Woo pleaded guilty to the second charge of unlawful trafficking and to the charge of violating a condition of release. The court sentenced Woo to seven years on the first charge of drug trafficking and to ten years, with all but two years suspended, and three years of probation on the second charge of drug trafficking, to be served consecutively. Woo appeals from the jury's verdict finding him guilty of the original count of unlawful trafficking. He does not, nor could he, challenge his plea of guilty on the other two charges.

[¶ 4] Woo argues here that the evidence presented at trial was not sufficient to prove beyond a reasonable doubt that he unlawfully trafficked in scheduled drugs. Specifically, Woo argues that the State failed to produce any evidence that he successfully manufactured methamphetamine or any other scheduled drug on or about May 31, 2005, as required by 17–A M.R.S. § 1103(1–A), and failed to prove that he even possessed all of the ingredients necessary to make methamphetamine.

[¶ 5] When reviewing challenges to the sufficiency of the evidence, we review the evidence in the light most favorable to the State to determine whether a fact-finder could rationally find beyond a reasonable doubt every element of the offense charged. *State v. Ullring*, 1999 ME 183, ¶ 28, 741 A.2d 1065, 1073. "[C]ircumstantial evidence is no less conclusive than direct evidence in supporting a [criminal] conviction." *State v. Kenney*, 534 A.2d 681, 682 (Me.1987). "A conviction may be based on circumstantial evidence, even if inferences made from such evidence are contradicted by parts of the direct evidence." *State v. Barnard*, 2001 ME 80, ¶ 11, 772 A.2d 852, 857 (quotation marks omitted).

[¶ 6] Viewed in a light most favorable to the State, the jury could have found the following facts. At Woo's request, an associate of Woo's purchased three or four pint-sized bottles of iodine from a farm supply company's catalog on three occasions during the winter of 2004 and spring of 2005. Woo had originally told his associate that he needed the iodine for animal fights, but later told him that he would one

---

1. In his petition, Woo also argues that: (1) the indictment was constitutionally insufficient; (2) the court abused its discretion in denying Woo's motion for change of venue; (3) the court improperly relied on factual information in a victim's impact statement when sentencing Woo; and (4) the court abused its discretion in allowing a State's witness to use an illustrative aid during testimony. These contentions lack merit.

day explain the real reason he needed the iodine.

[¶ 7] The first shipment was delivered to Woo's place of business, Caribou Metal Fabricating and Hydraulics (a welding business), and the second to the associate, who then forwarded all but one bottle to Woo. The Maine Drug Enforcement Agency (MDEA) learned of these shipments and contacted the associate just before the third delivery in the spring of 2005. MDEA's investigation into Woo's activities began in earnest after its agents spoke to Woo's associate.

[¶ 8] During the course of the investigation, MDEA received information from two other sources: Woo's father-in-law and a lieutenant in the Caribou Police Department. In March of 2005, Woo's then-wife, Tressa, contacted her father, Wayne Donovan, because she wanted his help moving out of the family home. When Donovan arrived at Woo's home, Tressa showed him a garbage bag located in the family's garbage can in the driveway by the road; the bag included empty packages of cold medicine, dry gas, and Coleman fuel. None of these items belonged to Tressa or to the children residing in the home, Tressa's ten-year-old son and Woo's eight-year-old daughter.

[¶ 9] Although Donovan did not then understand the significance of these items, he put the garbage bag of items into his truck and put the bag in his garage with the intent of disposing of it. When he returned to Woo's home later that day, Woo was present. Donovan mentioned the garbage bag of items to Woo, but Woo only responded that Donovan would not have to worry about it, because Woo would be out of Donovan's life.

[¶ 10] Donovan turned the garbage bag of items over to the MDEA on or about May 27, 2005. In the bag, MDEA investigators found the following: eight coffee filters with red residue on them; pH strips; several hundred striker plates from matches with the red phosphorous scraped off; thirty-four empty blister packs and twenty-one empty boxes of cold medicine; two empty containers of Coleman fuel; sixteen bottles of Heet dry gas; one bottle of water remover for gas tanks; a store receipt for coffee filters and gloves; an envelope upon which was written "35 grams iodine crystals, six grams red phosphorous, and 16 grams ephedrine";[2] a piece of paper that said "LWS Welding and Fabrication"; razor blades (which appeared to have been used to scrape red phosphorous off striker plates); a glass pump with plastic tubing that had red residue on it; and a video of children's cartoons. Lab tests performed on the coffee filters revealed residue consistent with striker plates from matchbooks.

[¶ 11] On May 8, 2005, a Caribou Police Department lieutenant had witnessed a man at Wal–Mart, accompanied by a young girl, buying items that the lieutenant believed were precursors for the manufacture of methamphetamine. Subsequent investigation revealed that Woo was the individual who purchased the items at Wal–Mart, which included plastic tubing, glass cookware, pH strips, matches, cold medicine, and camping fuel.

[¶ 12] During the trial, the State's witnesses explained how to manufacture methamphetamine in a clandestine lab using the "red phosphorous method." The witnesses testified that, in order to start the manufacturing process, one grinds up cold tablets and soaks the powder in a solvent such as Heet. This slurry is then filtered and processed, leaving a crusty residue. Then one collects the red phos-

2. An MDEA agent testified that this is a par-   tial recipe for methamphetamine.

phorous that has been scraped off of hundreds of matchbook striker plates, soaks the scrapings, and pours the red phosphorus liquid through coffee filters to collect the residue. This process leaves a rust or brown-red color on the filter.

[¶ 13] At the next step, iodine is used to make crystals that are boiled with the ephedrine mixture and the red phosphorus. The quantity of iodine needed exceeds the amounts found in the small bottles generally sold in local pharmacies; veterinary supply stores carry larger bottles. One has a liquid form of methamphetamine base at the completion of this step. This liquid is filtered again and lye is added to the remaining methamphetamine base to neutralize it; pH strips are used to check the acid level of the liquid. A solvent like camping fuel is then added. The addition of this solvent causes the liquid to separate, and the methamphetamine oil is removed. In essentially the last step of the manufacturing process, salt and sulfuric acid are mixed together to generate a gas that is directed through plastic tubing to transform the methamphetamine oil into the powdered form of methamphetamine. Finally, although not necessary to the manufacturing process, the brown methamphetamine powder is usually whitened for aesthetic purposes. The process of making methamphetamine typically results in strong chemical odors.

[¶ 14] Two MDEA agents testified that the large number of empty cold medicine packages and empty Heet bottles, and the evidence of the removal of red phosphorous from striker plates in the garbage bag turned over to them by Donovan indicated that methamphetamine was being manufactured using the red phosphorous method. Although the garbage bag contained no evidence of lye, it did contain empty camping fuel containers and pH

strips, both of which are used after lye in the drug manufacturing process.

[¶ 15] MDEA conducted a search of Woo's person, vehicle, and home on May 31, 2005. During those searches its agents found eleven more empty bottles of Heet anti-freeze in the garage and an open fifty-pound bag of rock salt on the porch. The agents found no methamphetamine.

[¶ 16] In addition to the evidence outlined above, the State presented testimony from Brian McBrearty. He testified that, in late 2004, he showed Woo the step-by-step process for making methamphetamine in his basement. The jury also heard that, in February or March of 2005, Tressa awoke to a strong smell in the house she shared with Woo and their children.

[¶ 17] At the close of the State's case, Woo moved for acquittal, which was denied. The jury found Woo guilty of the unlawful trafficking in scheduled drugs.

## II. DISCUSSION

[¶ 18] A person is guilty of unlawful trafficking in a schedule W drug when the person (1) intentionally or knowingly traffics in; (2) what the person knows or believes to be a scheduled drug, which; (3) is in fact a scheduled drug; and (4) the drug is a schedule W drug. 17–A M.R.S. § 1103(1–A)(A). "Trafficking," as used in this case, means, "to make, create, manufacture." 17–A M.R.S. § 1101(17)(A) (2006). "Manufacture" means "to produce, prepare, propagate, compound, convert or process, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis." 17–A M.R.S. § 1101(4) (2006).

[¶ 19] As Woo correctly notes, the State presented no direct evidence at trial that he successfully made, created, or manufactured methamphetamine. No

methamphetamine or traces of methamphetamine were found, despite searches of Woo's person, car, home, and garage. In addition, there was no direct evidence linking Woo to lye, an essential ingredient in the making of methamphetamine. There also was no evidence that anyone saw Woo make or possess methamphetamine.

[¶ 20] The State did, however, present substantial circumstantial evidence that Woo successfully made methamphetamine, including the following: a friend showed Woo how to make methamphetamine; Woo was seen purchasing large quantities of most of the ingredients and items necessary for making methamphetamine; empty or used containers of ingredients and items commonly utilized in the manufacture or processing of methamphetamine were found in Woo's garbage, home, and garage, and the items did not belong to anyone else in the home; used coffee filters found in Woo's garbage tested positively for red phosphorous; a partial recipe for methamphetamine and a paper imprinted with a name similar to Woo's company's name were mixed in among the used methamphetamine ingredients; and Woo's wife smelled a strong smell in the house on one occasion shortly before methamphetamine ingredients were found in Woo's garbage. All of these pieces of evidence, taken together, would support an inference that Woo was producing, preparing, compounding, or processing methamphetamine.

[¶ 21] Although lye was not among the items found, the State offered evidence to demonstrate that pH strips and empty camping fuel containers were found in Woo's garbage, and that an open fifty-pound bag of rock salt was found on his porch. Camping fuel and pH strips are commonly used after lye in the next-to-last step in methamphetamine production. Salt is commonly used at essentially the last step of the process, when the methamphetamine oil is converted to powdered methamphetamine. The presence of pH strips in Woo's garbage, empty camping oil containers, and an open rock salt bag, in addition to the other items Woo purchased and possessed, indicates that methamphetamine was being manufactured, and is circumstantial evidence that Woo successfully completed the manufacture of methamphetamine. *See Barnard*, 2001 ME 80, ¶ 12, 772 A.2d at 857 (stating that direct or circumstantial evidence, including testimony of a witness who has experience based on familiarity with the drugs through law enforcement, can establish beyond a reasonable doubt the identity of drugs). Because there was direct and indirect evidence in the record that Woo had all of the substances needed to prepare or process methamphetamine, the jury could have reasonably inferred that Woo successfully manufactured methamphetamine. Based upon the evidence and the reasonable inferences flowing from that evidence, the jury could have rationally found beyond a reasonable doubt that Woo unlawfully trafficked in what was, in fact, a scheduled drug.

[¶ 22] In addition, the evidence on the record supports a finding that the State proved that Woo was guilty of manufacturing methamphetamine because he "prepared" or "processed" methamphetamine. *See* 17–A M.R.S. § 1101(4). Although we have not before been called upon to discuss the meaning of "manufacture" for purposes of the drug trafficking statute, 17–A M.R.S. § 1103(1–A), other courts whose statutory definitions of "manufacture" include produce, prepare, or process have done so. *See, e.g., Murrell v. State*, 273 Ga.App. 735, 615 S.E.2d 780 (2005). In *Murrell*, the defendant was convicted at trial of manufacturing methamphetamine although no methamphetamine was found in his home, and not all of the ingredients

necessary for the manufacture of methamphetamine were found. *Id.* at 783. In denying Murrell's appeal, the Georgia Court of Appeals, applying a statute with language nearly identical to that found in 17–A M.R.S. § 1101(4), stated:

> We conclude that when a defendant possesses most of the objects and substances needed to "prepare" or "process" methamphetamine by the red phosphorous technique, a rational trier of fact, applying OCGA § 16–13–21(15)'s broad definition of manufacture, could find beyond a reasonable doubt that the defendant was "preparing" or "processing" that drug.... [T]he evidence was sufficient to support reasonable inferences of "preparation" and "processing," and thus of manufacturing, even though the evidence does not show that he had the completed drug or all of the items needed to manufacture the completed drug.

*Id.* at 783–84; *see also Dawson v. State,* 786 N.E.2d 742, 748 (Ind.App.2003) (holding that, once an individual crushes up pills in order to separate the ephedrine from the pill binders, the methamphetamine manufacture process has begun); *People v. Lancellotti,* 19 Cal.App.4th 809, 813–14, 23 Cal.Rptr.2d 640 (1993) (holding that manufacturing a controlled substance from its component chemicals, by definition, does not necessarily include the finished product); *State v. Brown,* 109 Or.App. 636, 820 P.2d 878, 884 (1991) (holding that, because the definition of manufacture includes the production, preparation or processing of a substance, the legislature intended to prohibit "not simply possession of the controlled substance created by the prohibited means, but those acts that ultimately will result in the creation of a controlled substance").

[¶ 23] In this case, there was evidence that Woo was producing, preparing, and processing methamphetamine, all of which are encompassed in the definition of "manufacture." 17–A M.R.S. § 1101(4). The statute does not require the State to prove that the process has been completed before it applies. In this case, the evidence presented at trial was sufficient to permit the jury to reasonably infer that Woo was preparing or processing, and therefore manufacturing, methamphetamine.

The entry is:

Judgment affirmed.

ALEXANDER, J., with whom SILVER, J., joins, dissenting.

[¶ 24] I respectfully dissent. Today the Court holds that if a person (or his estranged father-in-law) had some of the ingredients to bake a cake, and someone once gave that person a recipe to bake a cake, then he can be found guilty of baking a cake, although no one saw him bake the cake, and no trace of a cake has ever been found. Our law does not permit beyond a reasonable doubt conviction on such flimsy evidence.

[¶ 25] Lucien Woo stands convicted of the Class B felony of trafficking in methamphetamine in violation of 17–A M.R.S. § 1103(1–A)(A) (2006). The State supports the conviction by pointing out that the definition of "trafficking" includes the "manufacture" of scheduled drugs as that term is defined in 17–A M.R.S. § 1101(4) (2006). The alleged manufacture of the scheduled drugs, according to the indictment, occurred on or about May 31, 2005.

[¶ 26] The Court acknowledges that "the State presented no direct evidence at trial that Woo successfully made, created, or manufactured methamphetamine." The Court also acknowledges that no trace of methamphetamine was ever found in searches of Woo, his vehicle, and his property. The Court further acknowledges

that there was no evidence linking Woo to lye, an essential ingredient of methamphetamine.

[¶ 27] The evidence that the State relies on to support the conviction for the Class B felony is limited to the following:

1. Sometime in 2004 an individual gave Woo a recipe for making methamphetamine.

2. In February or March 2005, on one occasion, Woo's estranged wife awoke to what she testified was a strong smell in the house they then shared. The nature of the smell was not further described in the evidence.

3. An acquaintance of Woo's, on three occasions in late 2004 and early 2005, purchased several bottles of iodine from a farm supply catalog and turned them over to Woo.

4. In March 2005, two months before the trafficking allegedly occurred, Woo's estranged father-in-law took a trash bag that contained, among other things, empty packages of cold medicine, dry gas, and Coleman fuel from Woo's home to his home.

5. The estranged father-in-law turned the trash bag over to law enforcement on or about May 27, 2005, several days before the trafficking allegedly occurred. After being in the estranged father-in-law's possession for more than two months, the bag was found to contain a significant number of empty packages of cold medicine, dry gas, gas tank water remover, Coleman fuel, coffee filters with a red residue, pH strips, a large number of matches with the red phosphorous scraped off, razor blades, a gas pump and plastic tube, a video of a children's cartoon and a partial, but not complete, recipe for methamphetamine.

6. On or about May 8, 2005, Woo was observed at the Caribou Wal–Mart purchasing some items that might be used in the manufacture of methamphetamine including plastic tubing, glass cookware, pH strips, matches, cold medicine, and camping fuel.

7. A May 2005 search of Woo's home resulted in discovery of an open bag of rock salt and some empty dry gas bottles.

[¶ 28] That is the sum and substance of the State's evidence used to convict Woo of trafficking in or manufacturing methamphetamine. The evidence was tied together with officers testifying as to how the items that the evidence showed that Woo, or his estranged father-in-law, had at one time possessed could be combined with other items not found to make methamphetamine.

[¶ 29] The reasoning to support this conviction is seriously flawed. As the reader will note, all of the items at issue are ones that can be purchased publicly at places such as Wal–Mart and are commonly found in and around rural Maine homes in the winter, particularly those that heat with wood. At the end of a long Maine winter an open bag of rock salt, empty bottles of dry gas, matches, razor blades, cold medicine, and Coleman fuel, and even a video of a children's cartoon, are items that one would certainly find in thousands of Maine homes. The quantities may be a little different than would be commonly found in an individual home. But Woo has not been charged and convicted of manufacture of a particular volume of methamphetamine. He has been convicted of manufacturing it because he, or his estranged father-in-law, possessed most of the ingredients.

[¶ 30] Possession of some ingredients that might be used to manufacture a prohibited substance, without more, is not enough to support conviction of manufacture of that substance. If the law were otherwise, and as the Court holds it to be today, then many rural Mainers and the managers of stores that sell these products, might be convicted of manufacture of methamphetamine. And many Maine farmers might be convicted of trafficking in or manufacture of explosives based on their possession of gasoline and some nitrogen-based fertilizers that can be the primary ingredients for manufacturing explosives. Maine law is not so harsh.

[¶ 31] In *State v. Tai*, 629 A.2d 594, 595 (Me.1993), we described the "two distinct propositions" that the State must prove to convict an individual of a crime. We stated:

First, the State must prove that the acts constituting the crime were done. Second, the State must prove the defendant's involvement in the criminal acts. Mere suspicion of a defendant's involvement in the commission of a crime does not supply evidence sufficient to support a conviction.

*Id.*

[¶ 32] The Court observes, and I agree, that in reviewing the sufficiency of the evidence to support the conviction, we must consider the evidence in the light most favorable to the State and we must give equal weight to both circumstantial evidence and direct evidence. *See State v. Barnard*, 2001 ME 80, ¶¶ 10–11, 772 A.2d 852, 857. Judging the propositions that our opinion in *Tai* indicates must be proved by those standards demonstrates the insufficiency of the evidence to support this conviction.

[¶ 33] In *Tai* we noted that "the State must prove that the acts constituting the crime were done." 629 A.2d at 595. Here

the State's evidence does not "prove that the acts constituting the crime were done." Beyond "mere suspicion" the State's evidence, at best, proves that at one time or another Woo, or his estranged father-in-law, possessed some, but not all, of the items used in the manufacture of methamphetamine. Evidence of a key ingredient, lye, was lacking. Further, the State proved that Woo had, or was aware of the recipe for making methamphetamine. Some of the ingredients, plus a recipe, plus suspicion, is not enough. As the State concedes, it presented no evidence that Woo ever possessed any methamphetamine related to the May 31, 2005, trafficking charge. Nor is there any evidence that Woo took any steps toward the manufacture of methamphetamine.

[¶ 34] Interestingly, the State's evidence could not support a conviction for attempted trafficking in or manufacturing of methamphetamine pursuant to 17–A M.R.S. § 152 (2006). To secure a conviction for attempt, the State must prove, beyond a reasonable doubt, both the intent to commit a particular crime and the defendant's taking a "substantial step" toward committing that crime. *State v. Long*, 577 A.2d 765, 765–66 (Me.1990). A "substantial step" is "any conduct that *goes beyond mere preparation* and is strongly corroborative of the firmness of the actor's intent to complete the commission of the crime." 17–A M.R.S. § 152(1) (emphasis added).

[¶ 35] Here, evidence of intent to traffic or manufacture is completely lacking, and the evidence of a substantial step being taken toward trafficking in or manufacture of methamphetamine is completely lacking. At best, the State has shown some preparation to manufacture or traffic. But the attempt statute tells us that "mere preparation" to commit a crime is not enough to support a conviction for

committing a crime or even for attempting to commit a crime.[3]

[¶ 36]   What the State has here is possession of some of the goods used in manufacture, a recipe, and "mere suspicion" that Woo may have manufactured methamphetamine.  *Tai* tells us that is not enough.  I would vacate the conviction.

---

**3.**  Absent a conspiracy theory not at issue here.  *See* 17–A M.R.S. § 151 (2006).