2008 ME 151

**STATE of Maine**

v.

**James F. SCHMIDT.**

Supreme Judicial Court of Maine.

Submitted on Briefs: June 26, 2008.

Decided: Oct. 7, 2008.

Jeffrey W. Davidson, Esq., Cutler, ME, for James Schmidt.

Michael E. Povich, District Attorney, Benjamin P. Dyer, Asst. Dist. Atty., Ellsworth, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, SILVER, and GORMAN, JJ.

CLIFFORD, J.

[¶ 1] James F. Schmidt appeals from a judgment of conviction entered on a jury verdict in the Superior Court (Washington County, *Wheeler, J.*) finding him guilty of two counts of theft by unauthorized taking or transfer (Class B), 17–A M.R.S. § 353(1)(A), (B)(1) (2007); six counts of theft by unauthorized taking or transfer (Class C), 17–A M.R.S. § 353(1)(A), (B)(4) (2007); one count of theft by misapplication of property (Class B), 17–A M.R.S. § 358(1)(A), (B)(1) (2007); and one count of negotiating a worthless instrument (Class C), 17–A M.R.S. § 708(1)(A), (B)(2) (2007). Schmidt challenges the jury selection process, the prosecutor's statements made during closing arguments, and the sufficiency of the evidence supporting each

count of his conviction. We affirm in part and vacate in part.

## I. BACKGROUND

[¶ 2] Viewing it in the light most favorable to the State, *see State v. Woo*, 2007 ME 151, ¶ 5, 938 A.2d 13, 14, the following evidence was admitted at trial. In June of 2005, Schmidt began efforts to purchase a three-story building located on Main Street in the City of Calais. Schmidt indicated that he planned to renovate the building on behalf of his non-profit organization, the Wantaqo'ti Foundation (the Foundation), to benefit Native American and disadvantaged people.

[¶ 3] Schmidt presented a business plan to the City to obtain loan funds with which to create retail and residential space in the building. The City, through its Loan Review Board, granted Schmidt a loan from its Economic Development Loan Fund in the amount of $100,000. Of that amount, $70,000 was used to purchase the building, and the remaining $30,000 was to be disbursed in increments to Schmidt as a construction loan to complete the renovations. An additional $40,000 was to be supplied by the Foundation. The parties closed on the property on July 15, 2005.

[¶ 4] Over the next eight weeks, the City disbursed to Schmidt, in increments of a few thousand dollars each week, the $30,000 in construction loan funds. Although the checks were made out to the Foundation, they were deposited into a bank account from which only Schmidt had the right to draw funds. The construction loan funds were to be used only for materials and labor for the building's renovation, and were not to be used for salary payments to Schmidt or to anyone else.

[¶ 5] By the terms of his agreement with the City, Schmidt was to begin making monthly loan repayments to the City on September 1, 2005. Schmidt never paid to the City any amounts due on the loan.

[¶ 6] Meanwhile, Schmidt hired numerous subcontractors and purchased various materials to complete construction on the building. Schmidt failed to pay, in accordance with their agreements, at least six of these subcontractors and suppliers, including: (1) $6729.46 to Gregory Pollack of A & E Plumbing, (2) $3579.39 to William Barnett of Riverside Electric, (3) $8680.89 to Johnson's True Value, (4) $6089.10 to Mark Wright of Mark Wright Construction and Disposal, (5) $1100 to Zaccheriah Gidney, and (6) $2380 to Steven Scott. Schmidt also wrote numerous checks over the course of several weeks totaling more than $10,000 to various subcontractors, suppliers, and other purveyors. Those checks were not honored by the bank because of insufficient funds in the account. Instead, Schmidt used the City's loan funds to pay a salary to himself, and to his girlfriend.

[¶ 7] By indictment dated December 13, 2005, Schmidt was charged with one count of theft by unauthorized taking or transfer (Class B), 17–A M.R.S. § 353(1)(A), (B)(1), and six counts of theft by unauthorized taking or transfer (Class C), 17–A M.R.S. § 353(1)(A), (B)(4). The State later consolidated these counts with those of a second indictment, dated June 21, 2006, charging Schmidt with: theft by misapplication of property (Class B), 17–A M.R.S. § 358(1)(A), (B)(1); theft by unauthorized taking (Class B), 17–A M.R.S. § 353(1)(A), (B)(1); and negotiating a worthless instrument (Class C), 17–A M.R.S. § 708(1)(A), (B)(2).

[¶ 8] Following a four-day trial in October of 2006, a jury found Schmidt guilty on all ten counts. The court sentenced Schmidt to eight years incarceration with none suspended as to the three Class B

counts, and to four years incarceration, none suspended, for all remaining counts, to be served concurrently. The court also ordered Schmidt to pay restitution in the amount of $82,908.33. Schmidt filed this appeal.

## II. DISCUSSION

### A. Jury Selection

[¶ 9] Schmidt first contends that jury selection for his trial was "constitutionally unfair" in several respects. He argues that his right to individually voir dire the jury pool was impermissibly denied, that the court erred in failing to excuse for cause two jurors who expressed bias, that the jury was tainted by statements made by potential jurors in front of the entire jury pool, and that the court impermissibly disqualified the defense attorney's father for cause without having questioned the father as to his potential bias.

[¶ 10] "The trial court has broad discretion over the conduct of voir dire, and the court's decisions in that area will be upheld absent abuse of that discretion." *State v. Collin,* 1999 ME 187, ¶ 7, 741 A.2d 1074, 1076–77 (quotation marks omitted).

[¶ 11] The trial court conducted individual voir dire as to numerous potential jurors. To the extent the court refused to allow Schmidt to conduct additional individual voir dire, that refusal was not error. Although "[a]reas of potential juror bias should receive special attention during voir dire," it is within the trial court's discretion to "appropriately craft questions probing for juror bias." *Id.* ¶ 7, 741 A.2d at 1077. As M.R.Crim. P. 24 plainly permits, the court elected to conduct the initial examination of the jury itself. Only if the additional questions Schmidt's attorney sought to ask were both relevant to jurors' qualifications and had not been fully explored by the court would Schmidt's contentions concerning the voir dire have merit. *See* M.R.Crim. P. 24(a). It is clear from the record, however, that the court spent a great deal of time questioning the jurors as to potential prejudice, and fully explored every area into which Schmidt requested additional inquiry. *See Collin,* 1999 ME 187, ¶¶ 7, 8, 741 A.2d at 1077 (noting that the court may address juror bias through more generalized questions than the defendant wishes, and need not question jurors "in the exact manner requested by [the defendant]"). The court neither erred nor acted beyond its discretion in refusing Schmidt's request for additional voir dire.

[¶ 12] Schmidt also contends that the court should have excused for cause two jurors who, he asserts, manifested prejudice. We disagree. Juror # 82 indicated that she had read two articles about the case in the local newspaper, and that she knew nine of the witnesses, but also stated that she had no "tight connections" with any of the witnesses; that she was "not friends [with any witnesses], per se," but instead "just know[s] these people"; that she had never discussed the case with any of the witnesses she knew; and that she could be fair and impartial in deciding the case. Further, although Juror # 82 noted that the articles "came across that [Schmidt] had done it" and that they were "kind of worded [to suggest that] a scheme happened," she also explicitly stated that she had not formed any of her own opinions about the matter, had not found the articles persuasive either way, and had only skimmed the articles. Likewise, Juror # 75 was acquainted with sixteen of the forty-two witnesses on the witness list, but stated that she had no prior knowledge of the case, that she would not give any of those sixteen any more credibility than any other witness, that it would not be personally difficult for her to sit in

a case in which she knew some of the witnesses, and that she could be fair and impartial in deciding the case. The court was persuaded by the explicit statements of both jurors that they could decide Schmidt's case on a fair and impartial basis, and we do not disturb that decision.

 [¶ 13] Schmidt also contends that certain statements made by potential jurors in front of the rest of the jury pool operated to taint the entire pool. The statements to which Schmidt refers, made by four potential jurors in response to the court's question—"Is there any juror who's familiar with the facts of this case from any source whatsoever?"—were limited statements, two of which were truncated by the court to such an extent that their meaning was too vague to taint the jury pool in any way. Moreover, we agree with the State that "[t]he statements provided no more information about the crime to members of the jury pool and were no more prejudicial to the defendant than the reading of the indictment itself." In addition, the record indicates that a juror who was disqualified for expressing prejudice against Schmidt did not have the opportunity to taint the jury pool because of actions taken by a court security officer to prevent her from speaking about the case to the remaining potential jurors.

[¶ 14] Finally, we discern no error or abuse of discretion in the court's disqualification for cause of the defense attorney's father without questioning the father as to his potential bias.

## B. Closing Arguments

 [¶ 15] Schmidt next contends that statements made by the prosecutor during the State's closing argument constituted an impermissible attack on Schmidt's credibility. Specifically, Schmidt refers to the prosecutor's statements referring to Schmidt as a "con artist" and a "flim flam man." Because Schmidt never objected to any of the prosecutor's statements, did not move for a mistrial on that basis, and did not seek a curative instruction, we review the closing arguments only for obvious error. *See* M.R.Crim. P. 52(b); *State v. Ashley*, 666 A.2d 103, 105 (Me.1995). Obvious error is that error "so highly prejudicial it virtually deprives the defendant of a fundamentally fair trial." *Ashley*, 666 A.2d at 105 (quotation marks omitted).

[¶ 16] "We have repeatedly held that it is improper for a prosecutor to express an opinion on the credibility of a defendant." *State v. Casella*, 632 A.2d 121, 122 (Me. 1993). This is particularly true because prosecutors are "cloaked with the authority of the State, and [are] duty-bound to see that justice is done." *State v. Comer*, 644 A.2d 7, 9 (Me.1994). This rule is supported by M. Bar R. 3.7(e)(2)(v), which provides that a lawyer may not "[a]ssert a personal opinion as to . . . the credibility of a witness."

 [¶ 17] Nevertheless, "a lawyer may argue, on the lawyer's analysis of the evidence, for any position or conclusion with respect to the matters stated therein." M. Bar R. 3.7(e)(2)(v). "Although unable to assert personal opinion, a prosecutor may attack credibility by analyzing the evidence and highlighting absurdities or discrepancies in a witness's testimony." *Comer*, 644 A.2d at 9. The prosecutor is also permitted to "appeal to the jury's common sense and experience without crossing the line into prohibited argument." *Ashley*, 666 A.2d at 106 (quotation marks omitted). The issue is whether, "when a defendant contends that the prosecutor injected personal opinion into closing argument, . . . the challenged comment reflects an improper personal opinion or is an argument fairly based on the evidence." *Id.* at 105.

[¶ 18] In this case, the prosecutor's statements during closing do not constitute obvious error. None of the four statements challenged on appeal by Schmidt is an attack on Schmidt's credibility based on the prosecutor's personal beliefs, as is prohibited by Rule 3.7. Rather, the prosecutor permissibly encouraged the jury to question whether or not Schmidt was a con artist based on the totality of the evidence presented to it. Indeed, Schmidt's role as a "con artist" was precisely the evidence the jury was charged with evaluating, that is, whether Schmidt obtained money from the City that he used for impermissible purposes and that he never intended to pay back, or whether Schmidt acted in good faith but simply got in over his head. Moreover, the prosecutor never referred to Schmidt as a liar, and never injected language of personal belief. "Prosecutors are permitted ... to argue for any position or conclusion stated in the evidence, and to employ wit, satire and invective in arguing for that position or conclusion provided it is grounded in the evidence." Robert W. Clifford, *Identifying and Preventing Improper Prosecutorial Comment in Closing Argument*, 51 Me. L.Rev. 241, 267 (1999) (footnotes, quotation marks, and alteration omitted). That is precisely what the prosecutor did in Schmidt's case.

## C. Sufficiency of the Evidence

[¶ 19] Finally, Schmidt challenges the sufficiency of the evidence as to each of his ten convictions. We view the evidence "in the light most favorable to the State to determine whether a fact-finder could rationally find beyond a reasonable doubt every element of the offense charged." *Woo*, 2007 ME 151, ¶ 5, 938 A.2d at 14. The fact-finder is permitted to draw "all reasonable inferences from the evidence." *State v. Moores*, 2006 ME 139, ¶ 7, 910 A.2d 373, 375 (quotation marks omitted). Determinations of the weight and credibility to be afforded the evidence are within the fact-finder's exclusive province. *State v. Basu*, 2005 ME 74, ¶ 20, 875 A.2d 686, 692.

### 1. Theft by Unauthorized Taking or Transfer (Count I)

[¶ 20] A theft by unauthorized taking or transfer occurs when the defendant "(1) obtained or exercised unauthorized control (2) over the property of another (3) with intent to deprive the owner of that property." *State v. Bouchard*, 2005 ME 106, ¶ 15, 881 A.2d 1130, 1135 (quotation marks omitted); *see* 17–A M.R.S. § 353(1)(A). Such theft is a Class B crime when, as here, the value of the subject property exceeds $10,000. 17–A M.R.S. § 353(1)(B)(1).

[¶ 21] The evidence is sufficient to support the jury's finding, beyond a reasonable doubt, that Schmidt misused the money from the loan fund for personal purposes, and thereby committed theft by unauthorized taking or transfer in an amount over $10,000. Although the checks to Schmidt were made out to the Foundation, the State established that Schmidt was the only person who had the right to draw funds on the account in which loan funds were deposited; that Schmidt did not use the money for the purposes intended, but rather used it to pay a salary to himself and his girlfriend, purposes not approved by the City; and that Schmidt retained the loan funds long after he was obligated to have repaid them to the City. Further, Schmidt's intent can be inferred from the evidence.

### 2. Theft by Unauthorized Taking or Transfer (Counts II, III, IV, V, VI, and VII)

[¶ 22] Schmidt's convictions for theft in Counts II through VII are based

on the State's allegations that Schmidt failed to compensate six individuals who provided products or services for the building's renovation: (1) Gregory L. Pollack of A & E Plumbing, (2) William Barnett of Riverside Electric, (3) Johnson's True Value, (4) Mark Wright of Mark Wright Construction and Disposal, (5) Zaccheriah Gidney, and (6) Steven J. Scott.

[¶ 23] There is competent record evidence to establish that Schmidt exercised control over City funds, and to support a reasonable inference that Schmidt intended to deprive the six named victims of the money they were owed for their work on the Main Street building. The evidence is insufficient, however, to support a finding that Schmidt ever exercised unauthorized control, within the meaning of the criminal statutes, over money that was the property of the six named victims based on his failure to pay them according to their agreement.

[¶ 24] In *State v. Nelson*, the defendant was convicted of several counts of theft by unauthorized taking. He had contracted with several landowners who were to supply him with timber in exchange for payment. 1998 ME 183, ¶ 2–3, 714 A.2d 832, 832–33. Nelson paid only one of the timber suppliers a partial amount owed and paid the remaining suppliers none of what he owed them. *Id.* ¶ 2, 714 A.2d at 832. We vacated Nelson's conviction on the ground that an unpaid money obligation owed to another person gives rise only to a security interest, and that the unpaid debt does not constitute "property of another" pursuant to the theft statutes, and thus could not support a conviction for theft by unauthorized taking. *Id.* ¶ 5, 714 A.2d at 833.

[¶ 25] Our decision in *Nelson* is relevant to Schmidt's case. The criminal statute defines "[p]roperty of another" as "property in which any person or govern-ment other than the actor has an interest that the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property." 17–A M.R.S. § 352(4) (2007). Further, "[p]roperty in the possession of the actor may not be deemed property of another who has only a security interest therein, even if legal title is in the creditor pursuant to a conditional sales contract or other security agreement." 17–A M.R.S. § 352(4). In this case, the loan funds, at least at the time, were properly in Schmidt's possession, and did not constitute property belonging to the six unpaid subcontractors and suppliers. Rather, the victims had only a right to payment that could afford them a security interest in the form of a mechanic's lien on the property. We therefore vacate Schmidt's convictions as to Counts II through VII for lack of sufficient supporting evidence.

3. Theft by Misapplication of Property (Count VIII)

[¶ 26] A theft by misapplication of property occurs when the defendant:

obtains property from anyone or personal services from an employee upon agreement, or subject to a known legal obligation, to make a specified payment or other disposition to a 3rd person or to a fund administered by that person, whether from that property or its proceeds or from that person's own property to be reserved in an equivalent or agreed amount, if that person intentionally or recklessly fails to make the required payment or disposition and deals with the property obtained or withheld as that person's own.

17–A M.R.S. § 358(1)(A); *see Nelson*, 1998 ME 183, ¶ 6, 714 A.2d at 833–34. Charges of theft by misapplication should not result for "mere civil failure to perform a con-

tractual obligation," and "criminal liability should be limited to those situations [involving] a kind of trust or fiduciary obligation." *Nelson*, 1998 ME 183, ¶ 6, 714 A.2d at 833–34 (quotation marks omitted). Thus, the State was required to establish the existence of an "agreement or legal obligation to make payment from property obtained or its proceeds or from property to be reserved in equivalent amount," either by establishing that the defendant acted as the victim's agent or that he held proceeds in trust for the victim. *Id.* ¶¶ 6, 8, 714 A.2d at 834 (quotation marks omitted). When the value of the property exceeds $10,000, as here, theft by misapplication of property is a Class B crime. 17–A M.R.S. § 358(1)(B)(1).

[¶ 27] Schmidt's conviction for theft in Count VIII is based on evidence that Schmidt, as an agent for the Foundation, improperly retained money intended to compensate subcontractors, suppliers, and others whose labor and services were utilized in renovating the Main Street building. The State did establish that Schmidt obtained and administered City money on behalf of the Foundation totaling more than $10,000, on the condition of payment of those funds to suppliers and subcontractors for goods and services rendered in renovating the building, and that Schmidt failed to make those requisite payments, instead retaining the money for personal purposes for himself and his girlfriend. A reasonable view of the evidence also establishes that Schmidt had a trust obligation to the Foundation, as the sole person with control over its funds, and supports a conviction of theft by misapplication of property.

### 4. Theft by Unauthorized Taking or Transfer (Count IX)

[¶ 28] Schmidt's conviction for theft in Count IX stems from the State's allegations that Schmidt, as an agent of the Foundation, misappropriated loan funds for his own personal benefit rather than compensating subcontractors and suppliers. As discussed above, the State established that Schmidt obtained funds in the name of the Foundation that were to be used for building materials and labor, and that Schmidt misappropriated those funds by keeping the funds for his own salary and by paying some of the funds to his girlfriend. Thus, Schmidt kept the funds for his personal use rather than paying the subcontractors and suppliers he owed for materials and labor already supplied, contravening the terms pursuant to which he was given the funds.

### 5. Negotiating a Worthless Instrument (Count X)

[¶ 29] A person negotiates a worthless instrument when he "intentionally issues or negotiates a negotiable instrument knowing that it will not be honored by the marker or drawee." 17–A M.R.S. § 708(1)(A); *see also State v. Murray*, 604 A.2d 903, 904 (Me.1992). When, as here, the value of the instrument is between $1000 and $10,000, negotiating that instrument is a Class C crime. 17–A M.R.S. § 708(1)(B)(2).

[¶ 30] Schmidt's conviction for negotiating a worthless instrument in Count X stems from the State's allegations that Schmidt issued twenty checks totaling $4733.73 from the Foundation checking account, knowing that there were insufficient funds in the account to cover those amounts. In challenging the evidence supporting these elements, Schmidt primarily relies on 17–A M.R.S. § 708(2)(B) (2007). Section 708(2)(B) provides:

2. Proof of the following gives rise to a permissible inference under the Maine Rules of Evidence, Rule 303 that the

person issuing or negotiating the instrument knew that it would not be honored:

. . .

**B.** Payment was refused by the drawee for lack of funds upon presentment made within the time frame specified in Title 11, section 3–1304, and the drawer failed to honor the drawer's contract within 5 days after actual receipt of a notice of dishonor, as defined in Title 11, section 3–1503, provided that this time limit is tolled during one subsequent representment of the negotiable instrument.

17–A M.R.S. § 708(2)(B). The State established that Schmidt wrote numerous checks to various subcontractors totaling between $1000 and $10,000 that were dishonored by the bank for insufficient funds. Although Schmidt contends that eighteen of the nineteen dishonored checks were paid within five days of notice that they were dishonored, there is more than ample evidence supporting a finding that they were not. Schmidt's knowledge that the checks would be returned can be inferred from his course of dealing over the span of months in which he wrote multiple checks on insufficient funds to multiple victims, all the while explaining the problem with various unsubstantiated excuses. Whether Schmidt later paid some of the amounts owed is a matter of restitution, and does not constitute a defense to the charge.

The entry is:

Judgment of conviction as to Counts I, VIII, IX and X is affirmed. Judgment of conviction as to Counts II through VII is vacated. Remanded to the Superior Court for resentencing.