2012 ME 60

**STATE of Maine**

v.

**Kirk E. GOULD.**

Supreme Judicial Court of Maine.

Argued: Jan. 11, 2012.

Decided: May 1, 2012.

Sarah LeClaire, Esq. (orally), Presque Isle, for appellant Kirk E. Gould.

Todd R. Collins, District Attorney, and Kurt A. Kafferlin, Asst. Dist. Atty. (orally), 8th Prosecutorial District, Houlton, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Kirk E. Gould appeals from a judgment of conviction of gross sexual assault (Class A), 17–A M.R.S. § 253(1)(B) (2011), and gross sexual assault (Class B), 17–A M.R.S. § 253(2)(H) (2011), entered in the Superior Court (Aroostook County, *Hunter, J.*) following a jury trial. He contends that (1) the court erred in deny-

ing his motion to suppress his confession as involuntary; (2) he was denied a fair trial based on the prosecutor's misrepresentation of the evidence in closing argument; and (3) the court erred by denying his motions for a new trial and sanctions based on a discovery violation. We affirm the judgment.

## I. BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to the jury's verdict and to the court's orders on the motions to suppress, for a new trial, and for sanctions, the record supports the following facts. *See State v. Nigro,* 2011 ME 81, ¶ 2, 24 A.3d 1283.

### A. The Interrogation

[¶ 3] In the evening of May 22, 2007, Maine State Police Detective Joshua Haines questioned Gould about allegations that Gould had sexually abused his stepdaughter. The interview took place in Haines's police car, which was parked at Gould's parents' house, and was recorded. A Department of Health and Human Services caseworker was present for the first half of the interview. Gould was not handcuffed, and he was not impaired by drugs or alcohol.

[¶ 4] Haines read Gould his *Miranda* rights, asking whether he understood each one. Gould said yes and agreed to answer Haines's questions, even though Haines was clear that Gould did not have to talk to him and that he could stop answering questions at any time. Until about thirty minutes into the interview, Gould denied having had any sexual contact with the victim, and at that point, the Department caseworker departed.

[¶ 5] The questioning continued, with Haines stating that he had no doubt that Gould had engaged in sexual activity with the victim and that he wanted to understand why it happened. Haines said he

knew that Gould's DNA would be found on items collected for testing. He asked if Gould was "man enough" to admit what happened and that he needed help, stating "we'll give you all the help we can get," and asked if the victim had done anything to provoke him. Gould responded that the victim had initiated sexual contact with him. He made further incriminating statements, acknowledging that his sexual activity with the victim had begun before she turned fourteen and continued until two days before the interrogation, when she was sixteen. Haines suggested to Gould that he should write an apology letter to the victim, which Gould then wrote on paper provided by Haines.

### B. Pretrial Procedure

[¶ 6] Gould was arrested and indicted for gross sexual assault (Class A), 17–A M.R.S. § 253(1)(B), and gross sexual assault (Class B), 17–A M.R.S. § 253(2)(H). He pleaded not guilty to both charges, and moved to suppress the statements he made to Haines as involuntary. After a hearing, the court denied the motion, finding that the interview was "conversational and relaxed," Gould "participated freely," his demeanor did not change throughout the questioning, and he was not promised leniency in exchange for confessing.

[¶ 7] A half hour or so prior to the start of trial on July 22, 2009, Detective Haines delivered to the assistant district attorney a copy of a forensic chemistry report from the Maine State Police Crime Laboratory analyzing bedding and body tissue samples from the victim that had been collected on the day of Gould's arrest. Soon thereafter, the assistant district attorney delivered a copy of the report to Gould's defense counsel. The report, dated July 14, 2009, was mailed to Detective Haines on July 16, but he had previously spoken about the results by phone with the

956

author of the report on or about July 13. Detective Haines first found the hard copy report on his desk on July 22. The results indicated the presence of prostate specific antigen (PSA) and a presumptive positive result for seminal fluid on the victim's bed sheet, but no sperm cells. Because the lab needed sperm cells to test for DNA at that time, no further analysis was performed.[1] Neither the State nor Gould sought to introduce the report as evidence at trial.

## C. Jury Trial

[¶ 8] The victim was among the witnesses for the State, and she testified that Gould had abused her from when she was eleven years old until two days before he was arrested in 2007, when she was sixteen. In addition, the State presented testimony from the victim's two brothers, her mother, and Detective Haines. Both the recording of Gould's interrogation and his apology letter were admitted into evidence over Gould's objection. Although Gould did not testify, he presented testimony by two family friends and his physician. Gould's physician testified about Gould's circulatory problems and years of treatment for erectile dysfunction.

[¶ 9] The jury convicted Gould on both counts, and the court sentenced Gould on Count I to twenty-five years imprisonment, with all but twelve years suspended and four years of probation, and on Count II to a concurrent ten-year term of imprisonment. The court also ordered that Gould be subject to lifetime registration as a sex offender. Gould timely appealed the conviction and sentence.[2]

[¶ 10] Gould subsequently filed a motion for a new trial and a motion for sanctions alleging that the prosecution had violated M.R.Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194,

10 L.Ed.2d 215 (1963), by failing to provide him with the July 2009 crime lab report within a reasonable time prior to trial. After a hearing, the court denied both motions, finding that Gould received the report in a timely manner and that it was not exculpatory. Gould's appeal from the denial of these post-trial motions was consolidated with his appeal from the underlying conviction.

## II. LEGAL ANALYSIS

### A. Voluntariness of the Confession

[¶ 11] "We review the denial of a *motion to suppress for clear error* as to factual findings and de novo as to issues of law." *State v. Dodge*, 2011 ME 47, ¶ 10, 17 A.3d 128 (quotation marks omitted). "Whether a confession is voluntary is primarily a question of fact." *State v. Lavoie*, 2010 ME 76, ¶ 13, 1 A.3d 408 (quotation marks omitted). A voluntary confession is one that is the result of a "free choice of a rational mind," that is "not a product of coercive police conduct," and whose admission, "under all the circumstances[,] . . . would be fundamentally fair." *Id.* ¶ 18. When assessing voluntariness, we look at the totality of the circumstances, and we consider all relevant factors, including the duration and location of the interrogation; whether it was custodial; recitation of *Miranda* warnings; police threats or promises; and the defendant's age, health, and conduct. *See id.* Gould specifically contends that his confession was involuntary because it was induced by Detective Haines telling Gould that he would "get him help" and that the State would have DNA evidence that would establish his guilt.

---

1. Subsequent to the trial, the lab gained the capacity to test PSA for DNA.

2. The Sentence Review Panel denied Gould's sentence review application in February 2011.

■■ [¶ 12] The record supports the court's findings that Haines was not confrontational or aggressive with Gould and that "[t]he interview was conducted in a very conversational and relaxed manner." Gould was not in custody during the questioning. *See State v. Williams*, 2011 ME 36, ¶ 8, 15 A.3d 753 (concluding that an interrogation in a police car was noncustodial because it occurred near the defendant's home, he was not physically restrained, expressed no fear, and both parties' tones were calm). Haines read Gould his *Miranda* rights nevertheless, and Gould waived them. The court found that Gould "participated freely in the interview and volunteered a substantial amount of what he apparently believed was relevant information." Further, Detective Haines "never made any threats to [Gould] nor did he make any promises of leniency or favorable treatment in his case if [Gould] admitted his guilt."

[¶ 13] The court's findings are supported by record evidence and are not clearly erroneous. Detective Haines's suggestions that the State would get Gould help, and that he expected to have DNA evidence to prove Gould's guilt at trial, were neither unfairly coercive nor misleading. *See Lavoie*, 2010 ME 76, ¶¶ 21, 24, 1 A.3d 408 (concluding that a confession was voluntary and not unfairly coerced by a promise that the defendant would receive counseling if he admitted his mistake). Because the record supports the court's findings, and the totality of the circumstances demonstrates that Gould's confession was voluntary, the court properly denied the motion to suppress.

### B. Denial of Fair Trial Based on Prosecutorial Misconduct

[¶ 14] Gould argues that the prosecution's misrepresentation of evidence during the rebuttal phase of its closing argument constitutes obvious error. In particular, he objects to the prosecutor's statement,

made to explain to the jury the absence of any DNA evidence, that, "Unfortunately, the testimony was the bed sheet[ ] had been washed." Gould contends that there was no evidence in the record to support the prosecutor's assertion that DNA evidence was absent because the victim's bed sheet had been washed and that evidence in the prosecutor's possession supported the opposite conclusion.

[¶ 15] The State argues that the isolated comment challenged by Gould did not misrepresent the evidence because it was supported by testimony from the victim and her mother that the victim had a habit of frequently washing her sheets, as often as every other day. The State also contends that Gould's assertion of error relies on facts outside the record that may not be considered on appeal, referring to the Maine State Police Crime Lab report, which was not admitted into evidence at trial, and to a post-trial affidavit from the lab chemist stating that neither the report nor her notes about the bed sheet indicated that she thought that the sheet had been washed or that the samples had been "compromised" by laundering. Assuming, however, that the prosecutor's comment constituted a misstatement, the State contends that Gould was not deprived of a fair trial by the statement.

■■ [¶ 16] Because Gould did not object to the prosecutor's statement, did not move for a mistrial, and did not seek a curative instruction, we review the prosecutor's alleged misrepresentation for obvious error. *See State v. Schmidt*, 2008 ME 151, ¶ 15, 957 A.2d 80; M.R.Crim. P. 52(b). To meet this standard, "there must be (1) an error, (2) that is plain, and (3) that affects substantial rights." *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147. If these elements are met, this Court will find obvious error only if "(4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Id.*

[¶ 17] We examine alleged prosecutorial misconduct by first determining whether misconduct occurred and, if it did, by then viewing "the comments of the prosecutor as a whole, looking at the incidents of misconduct both in isolation and in the aggregate." *State v. Clark*, 2008 ME 136, ¶ 7, 954 A.2d 1066 (quotation marks omitted). "[T]he central question is whether the prosecutor's comment is fairly based on the facts in evidence." *State v. Roberts*, 2008 ME 112, ¶ 45, 951 A.2d 803 (quotation marks omitted). However, because the alleged misconduct relates to the prosecutor's misrepresentation of facts outside the trial record, we must also look to the prosecutor's obligations as an advocate and officer of the court when evaluating the prosecutor's conduct. *See* M.R. Prof. Conduct 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal."); *State v. Ashley*, 666 A.2d 103, 105 (Me.1995) ("While the [Rules of Professional Conduct] apply to all attorneys, they apply with particular force to prosecutors because of their status as the community's representatives." (quotation marks omitted)).

[¶ 18] Here, the comment challenged by Gould was made by the prosecutor to rebut the portion of Gould's closing argument that emphasized the absence of DNA evidence. Gould's attorney argued:

> Now, recall one thing that Trooper Haines said to [Gould] a number of times throughout the second part of this taped interview that you heard. He said he had DNA evidence. He told [Gould] he had DNA evidence. Where is it? There is no DNA evidence in this case, none, nothing to give you to rely upon against [Gould]. Nobody seemed to know about this. So the question is, are you convinced beyond a reasonable doubt that it happened, that any of these supposed sexual acts happened?

The prosecutor's full statement in rebuttal was:

> You also heard [defense counsel] comment on Detective Haines' questioning and on the issue of Detective Haines telling the defendant—he told him, and you folks listened to it and you folks heard it, he said we have taken the bed sheet[ ]; and with the advances in DNA, we're likely—the evidence in this is going to come out. Unfortunately, the testimony was the bed sheet[ ] had been washed. . . . [A]nd Detective Haines got a confession. So . . . that's the state of the evidence there.

[¶ 19] Gould's closing argument challenged whether the State could meet its burden of proof without having produced DNA evidence. The prosecutor's response explained why Detective Haines would have expected to eventually have DNA evidence and suggested that there was no DNA evidence because the bed sheet had been washed. It also argued that, regardless of the absence of DNA evidence, the confession was sufficient to establish Gould's guilt. Although the prosecutor's statement that the bed sheets had been washed was not based on direct evidence and appears on its face to have been contrary to the crime lab chemistry report, for the reasons we will explain, it was based on an inference that could fairly be drawn from the evidence before the jury.

[¶ 20] The crime lab report, which was not admitted as an exhibit at trial but which both parties had received prior to the start of the trial, stated that the victim's bed sheet was stained and "soiled" and that biological evidence—including PSA and a presumptive positive for seminal fluid—was detected.[3] At the time the

---

**3.** The relevant portion of the laboratory's re- port regarding the sheet removed from the

report was prepared, the crime lab lacked the capacity to test for DNA in seminal fluid and PSA samples. In addition, the lab report was silent as to whether the sheet had been washed, and the authoring chemist's post-trial affidavit did not state that the sheet had been washed or that the stained and "soiled" nature of the sheet necessarily signaled that it had not been washed. There was also no evidence regarding the extent to which biological material, including soil and stains, may remain on a sheet after it has been washed.

 [¶ 21] Thus, based on the trial evidence, which did not include the results of the crime lab report, the jury reasonably could have inferred from the victim's testimony about her every-other-day laundry habits that the sheet, which was collected two days after the last episode of abuse, had been washed on either of those two days. A prosecutor may argue for any conclusion based on "facts and testimony in evidence and the reasonable inferences that [can] be drawn therefrom." *State v. Ardolino,* 1997 ME 141, ¶ 22, 697 A.2d 73. Nor was the prosecutor compelled to conclude from the crime lab report in his possession that the presence of soil and stains on the sheet necessarily excluded the possibility that the sheet had

been washed. The prosecutor did not engage in misconduct by urging the jury to draw the inference that there was no DNA on the sheet because it had been washed, and there is therefore no error requiring further analysis under the obvious error standard.

## C. Motions for New Trial and Sanctions

[¶ 22] Gould contends that the court erred in denying his motions for a new trial and for sanctions. He asserts (1) that the court erred in finding that the crime lab test results were provided to him prior to the beginning of trial; (2) that even if he did receive the results at that time, the State's last-minute production of the report deprived him of the time needed to prepare his defense in violation of the requirements of M.R.Crim. P. 16(a)(1)(C), which requires the State to furnish exculpatory information to the defendant "within a reasonable time"; and (3) that this late disclosure also violated the constitutional guarantee of due process, as provided in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[4]

### 1. Factual Finding

 [¶ 23] We review for clear error Gould's assertion that the court erred

---

victim's bed stated:

> This item consists of a plastic "Hannaford" bag containing a bright pink and purple print "Spring" fitted sheet, twin size. Visual examination revealed the presence of numerous stains on this soiled sheet. Illumination with an alternate light source caused some of these stains to fluoresce and revealed additional stains on this sheet. Presumptive chemical tests for the presence of seminal fluid/semen were positive on several of these stains and negative on all the other stains. Cuttings from three stained areas were removed . . . and were packaged with the original item. Portions of each of these cuttings . . . were further tested. No sperm cells were identified in extracts of these cuttings. . . . These samples were also

tested for the presence of PSA. PSA was detected in each of these extracts.

4. The Supreme Court has described the *Brady* standard:

> Under *Brady,* the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. . . . [E]vidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.

*Smith v. Cain,* 565 U.S. ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) (quotation marks and citations omitted); *see also State v. Brewer,* 1997 ME 177, ¶¶ 31–32, 699 A.2d 1139 (applying the same standard).

in its fact-finding. *See State v. Kent,* 2011 ME 42, ¶ 10, 15 A.3d 1286. At the hearing on Gould's motions, Detective Haines, the assistant district attorney, and a secretary in the District Attorney's office all testified that the lab report was delivered to the District Attorney's office and then given to Gould's attorney the morning of the trial. Gould's trial attorney testified that he recalled receiving the report close in time to the completion of the State's trial evidence. Because the court was free to base its factual findings on the testimony of the State's witnesses, it did not err in finding that the report was delivered prior to the beginning of trial and as soon as the assistant district attorney received it. *See State v. Ahmed,* 2006 ME 133, ¶ 21, 909 A.2d 1011 ("[T]he court is free to determine which witnesses to believe and which evidence to accept or reject as trustworthy or untrustworthy.").

2. M.R.Crim. P. 16

[¶ 24] Whether to order a new trial as a sanction for failure to comply with M.R.Crim. P. 16 is within the discretion of the trial court and is reviewed for an abuse of that discretion. *See State v. Mannion,* 637 A.2d 452, 454 (Me.1994). We will not characterize a trial court's decision not to impose sanctions as "an abuse of discretion or an error of law unless the defendant has shown that he was in fact prejudiced by the discovery violation . . . and that the prejudice rose to the level of depriving him of a fair trial." *State v. Leavitt,* 625 A.2d 302, 305 (Me. 1993) (quotation marks and alteration omitted).

[¶ 25] The record supports the court's findings that Gould received a copy of the crime lab report in the morning of the first day of trial, before the start of the trial. Although in some cases the disclosure of potentially exculpatory evidence on the morning of the trial—even if the dis-

closure technically occurs before the start of trial—may be inherently unreasonable pursuant to M.R.Crim. P. 16(a)(1)(C), this is not such a case. Here, the record establishes that Detective Haines was advised by telephone of the results from the lab on July 13, the written report was completed on July 15, and it was mailed to him on July 16. However, Haines was on vacation or sick on the days leading up to the trial and he first obtained a hard copy of the report on July 22. He immediately delivered the report to the prosecutor. The record also shows that the prosecutor provided Gould with a copy of the report as soon as he received it. The record further shows that the State did not intend to introduce the report or its substance into evidence at the trial, and that Gould knew well in advance of trial that the bed sheet had been sent to the crime lab for forensic evaluation and that a report was expected.

[¶ 26] The time between Detective Haines's telephone conversation regarding the test results and the mailing of the written report was only three days, and the delay between when the report was mailed and the date Gould received it was less than one week. There is no indication that the State unreasonably delayed delivering the test results to Gould, and on the facts of this case, the timeline by which the report was provided to Gould was reasonable.

[¶ 27] Gould has also failed to establish that he was prejudiced by this sequence of events. Gould had the lab report in his possession before the trial started. He neither requested a continuance so that he could have more time to analyze the results, nor raised an objection based on the timing of his receipt of the report. The court concluded that "there was neither a violation of M.R.Crim. P. 16(a)(1)(C) nor a violation of the principles set forth in *Brady*" because the State did not withhold

evidence—a required element for a *Brady* violation. The court also concluded "that the laboratory results were given to the Defendant both orally and in writing as soon as that evidence was reasonably available," and that both parties were at least aware of the lack of DNA evidence prior to jury selection. The evidentiary record supports these conclusions. The court's ultimate conclusion that Gould was not prejudiced by this sequence of events is sound.

### 3. *Brady v. Maryland*

[¶ 28] As we have previously stated with regard to *Brady*, "[w]hen the defendant is aware, before trial, of the exculpatory evidence alleged to have been withheld, he cannot claim that there has been an unfair trial in violation of due process." *State v. Kelly,* 2000 ME 107, ¶ 26 n. 11, 752 A.2d 188; *see also State v. Dube,* 478 A.2d 1138, 1142 (Me.1984) (declining to find an abuse of discretion where the defendant had "the opportunity immediately prior to trial ... to cure the defect he alleges the State created by its non-disclosure"). Here, because the court found that Gould was made aware of and, in fact, received the lab report prior to trial, he cannot succeed in his claim that his due process rights were violated.

[¶ 29] We are unpersuaded by Gould's remaining claims of error, including his contention that the court abused its discretion by denying his motions to continue based on the unavailability of witnesses, and we do not address them separately.

The entry is:

Judgment affirmed.