MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 52
Docket:        Som-23-55
Argued:        September 12, 2023
Decided:       July 18, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.*

# STATE OF MAINE

v.

# COREY W. FARLEY

LAWRENCE, J.

[¶1] Corey W. Farley appeals from a judgment of conviction of one count of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2024), and one count of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2024), entered by the trial court (Somerset County, *Mullen, C.J.*) after a jury trial. Farley argues that the court erred in denying his motions to suppress his statements to a police detective after determining that he was not in custody during his interview and in finding that his statements to the detective were voluntary. Farley also contends that the court erred in providing only a curative instruction in response to prosecutorial statements made during closing

---

\* Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

argument, regarding his ability to hear and his anxiety, that mischaracterized the evidence; in allowing prosecutorial statements during closing argument, regarding the meaning of emojis in a message chain, that were unsupported by the evidence; and in allowing prosecutorial statements during closing argument regarding the credibility of witnesses. We disagree and affirm the judgment.

## I. FACTS AND PROCEDURE

### A. Background

[¶2] "Viewing the evidence admitted at trial in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt." *State v. Athayde*, 2022 ME 41, ¶ 2, 277 A.3d 387.

[¶3] In the spring and summer of 2020, the victim frequently visited and spent the night at a friend's house, where Farley lived; the victim had spent time there for over a year. The victim was eleven years old.[1]

---

[1] Farley was twenty-eight or twenty-nine years old in November 2019, he was thirty-one years old at the time of trial in December 2022, and he was not married to the victim.

[¶4] The victim slept in Farley's bed. Farley touched the victim's genitals and had the victim touch Farley's genitals multiple times. Farley also had the victim engage in oral-genital contact multiple times.[2]

[¶5] After law enforcement received a complaint about Farley, a detective interviewed Farley on August 20, 2021. During the interview, Farley admitted to having oral-genital contact with the victim and having the victim touch Farley's genitals.

[¶6] Farley was charged initially by criminal complaint filed on August 24, 2021, and then by indictment filed on November 18, 2021, with one count of gross sexual assault (Class A) (Count 1), 17-A M.R.S. § 253(1)(C), and one count of unlawful sexual contact (Class B) (Count 2), 17-A M.R.S. § 255-A(1)(E-1). Farley pleaded not guilty.

B.    Motions to Suppress

[¶7] On October 4, 2021, Farley filed a motion to suppress his statements made in the interview with the detective. Farley contended that the interview violated his rights because he "was in a custodial interrogation" but "no *Miranda* warnings were given." On January 18, 2022, Farley filed a

---

[2] Farley and the victim also communicated via text message and social media from 2018-2020, and Farley sent pictures to the victim. The pictures showed, for example, Farley and the victim lying down together without shirts and Farley's arm around the victim as the victim slept shirtless.

4

supplemental motion to suppress. Farley argued that the court should suppress the statements for the additional reason that he "could not hear" the questions due to hearing loss and his confession was thus involuntary.

[¶8] The court held a hearing on the motions to suppress on August 12, 2022. The parties stipulated to the admission in evidence of the recording of the August 20, 2021, interview, and the interview was played during the hearing. The court heard the testimony of the detective; Farley did not testify. The parties subsequently submitted memoranda of law regarding the motions to suppress.

[¶9] In an order entered on August 26, 2022, the court denied Farley's motions to suppress. "Viewed in the light most favorable to support the suppression court's decision, the record on the motion[s] to suppress supports the following facts" found by the court. *State v. Ames*, 2017 ME 27, ¶ 2, 155 A.3d 881.

[¶10] In July 2021, a detective received a complaint that Farley had sexually abused the victim. The victim was interviewed by the Children's Advocacy Center, and the detective then unsuccessfully attempted to "solicit contact between the [victim] and [Farley] by . . . messaging [Farley]" while posing as the victim.

[¶11]  On August 20, 2021, the detective went to Farley's residence for approximately forty-five minutes and interviewed Farley for approximately forty minutes.  The interview was unscheduled, was recorded, and occurred mid-afternoon in an unmarked law enforcement cruiser in Farley's driveway, about ten yards from his residence.  The detective wore plain clothes but displayed his badge and firearm.

[¶12]  The detective said that he was there to gather information and "chat" with Farley to see if Farley was going to be "up front" with the detective "because that makes a world of difference,"[3] and Farley said that he had "nothing to hide."[4]  (Quotation marks omitted.)  The detective said that Farley did not have to talk to him and that Farley could stop talking to him and leave at any time.  The detective did not have any difficulty understanding Farley during the interview.  During the same time, Farley did not ask the detective to

---

[3] When asked at the hearing if the purpose of the interview was to obtain Farley's confession, the detective testified that he wanted Farley to tell the truth, even if that meant confessing to what was alleged.

[4] The detective's other statements to Farley included "I've got all kinds of pictures" of you without a shirt on, "the more upfront you are with [this]," "honesty [] and being forthright mean[s] a lot," "I'm [just] looking for you to . . . take [some] ownership of it," and "you knew . . . that was not right," and he asked Farley, "[A]re you sorry for what you did?"  (Quotation marks omitted.)

6

repeat any questions and did not show that he was having any problem hearing.[5]

[¶13] Based on the totality of the circumstances,[6] the court determined, by a preponderance of the evidence, that Farley was not in custody during the interview.[7] The court also determined that "[t]here is basically **no** evidence to support" Farley's contention that his "alleged hearing deficiency resulted in" him involuntarily making statements to the detective. The court further found that multiple factors indicated that Farley's statements were voluntary.[8]

---

[5] The court found that Farley did not exhibit any difficulty hearing during the suppression hearing.

[6] Specifically, the court highlighted that Farley "was just outside his home"; there was only one detective involved in the interview, which was "reasonably brief (less than an hour)" and "was 'relatively low-key and conducted in a conversational manner'"; Farley was told he could stop the interview at any time; Farley was not physically restrained; and Farley never asked to stop the interview. The court also found that Farley was told that he was not under arrest. The detective did not use this terminology in the recorded interview, but he did promise Farley that he would leave and that Farley would get to go home at the end of their interview. The court determined that the facts weighing in favor of finding Farley in custody were that the interview took place in a cruiser, Farley was the only suspect, and the detective told Farley about allegedly inculpatory communications between the victim and Farley that the detective had.

[7] The court also noted in a footnote that Farley had acknowledged in his memorandum that he was not interrogated. On November 9, 2022, Farley filed a motion requesting that the court "amend its order to correct [a] clerical error," arguing that the memorandum should have stated that Farley *was* subject to an interrogation. The court granted the motion in an order entered on November 15, 2022, stating that "[r]egardless of whether the issue of interrogation was at issue, the Court finds that [Farley] was not subject to **custodial interrogation**, and thus no *Miranda* violation occurred." The court ordered that the footnote be deleted from the court's August 26, 2022, order.

[8] Specifically, the court found that "there was only one interview" that was not custodial. The interview involved one detective; took place in a "neutral" location; and was relatively short, conversational, and civil. Although the detective was "persistent," he did not use trickery or threats, and nothing regarding Farley's age, health, emotional stability, or conduct suggested that the statements were involuntary.

**C.    Trial**

[¶14]  The court held a jury trial on December 14 and 15, 2022.  The court admitted in evidence photographs of messages displayed on the screen of a device and almost the entire recording of the detective's interview with Farley.[9] One of the photographs depicted a series of messages that began with Farley stating, "10:30 good boy 11 bad boy."  The victim responded, "Me bad boy," and Farley messaged, "11 tomorrow night bud."  The victim responded, "No," and used three emojis, which the victim testified were "a pointer at — like closing their finger meaning small and an eggplant emoji."[10]

[¶15]  The victim testified that the eggplant emoji meant "[a] penis," responded yes when asked if the victim was telling Farley that "he has a small penis," and explained that the victim "was making a joke."  The detective testified that because of his training and experience he knew that the eggplant emoji meant a penis; that he "deemed [the emoji] to be indicating there was some sort of activity going on with the male genitalia"; and that he thought the

---

[9]  In its statement of the issues presented, the State includes "whether the Trial Court properly ruled *in limine* to redact a portion of the recording" of Farley's interview with the detective, "under [Maine Rule of Evidence] 403."  The State, however, does not elaborate regarding this issue other than to say that the court "properly ruled *in limine* to redact a portion of the recording."  Regardless, the issue is moot because we affirm the judgment.

[10]  Farley then messaged, "Please bud, u know why."  The victim responded "N9," which the victim testified meant no, and then the victim messaged, "Plz 11."

8

emojis meant the victim was "saying, no, I don't want this" and that Farley and the victim "were talking about a sexual exchange that's going to happen."[11]

[¶16] Later during the trial, Farley and his aunt both testified that Farley had issues with hearing loss. Farley further testified that he was diagnosed with anxiety, which also affected his answers during the interview.

[¶17] During the prosecutor's closing argument, he discussed the victim's testimony and stated that it "had all of the hallmarks of truth," that the victim "was forthright," and that the victim "has been forthright and maintained the truth."[12] The prosecutor also stated to the jury that the emojis corroborated

---

[11] The detective testified, "Whether or not I was correct or not, we have been clarified today on what that actually meant."

[12] After stating to the jury that the victim's "testimony had all of the hallmarks of truth," the prosecutor continued,

> First, [the victim] answered all of the questions asked . . . as best [as the victim] could and [the victim] did it directly. If you examine the jury instructions that you are going to be sent back with, it is going to give you a number of different ways in which you can evaluate someone's testimony. . . . [Y]ou may consider whether the witness was forthright. [The victim] was forthright. [The victim's] testimony was very — clearly very emotional and very difficult for [the victim]. We could plainly see that on the stand.
>
> It defies logic to think that [the victim] would maintain a deception to this extent and at such great personal and emotional cost to get up here in front of this group and tell that story. There was no evidence introduced about any equivocation in [the victim's] account.
>
> You will see in the jury instructions, again you may consider whether . . . on some prior occasion the witness made a statement inconsistent with their testimony. There was no evidence of that. Since [the victim] has disclosed to [the victim's] mother, [the victim] has been forthright and maintained the truth.

the victim's account of the events.[13]  Farley did not object to the prosecutor's statements.

[¶18]  During the prosecutor's rebuttal, he stated to the jury that there was no evidence other than Farley's testimony to show that Farley had hearing issues or anxiety.[14]  Farley's counsel objected, and the court instructed the jury that "the attorneys are free to argue what they say the evidence shows or what the evidence doesn't show or what there is or isn't for evidence, but it is your

---

The prosecutor later stated to the jury, "The second [h]allmark of truth and justified by [the victim's] testimony is that it is corroborated, right."

[13]  The prosecutor argued,

> A fair reading of those texts, especially in the context of the relationship described by [the victim] and described by the defendant on the recording with [the detective][,] is that the defendant was implying that he wanted [the victim] to be a bad boy starting at around 11 o'clock at night when [the victim] went to bed in Corey Farley's bed. That's where [the victim] slept . . . . The implication is that he was going to do naughty things in bed with [the victim].  That's what those emojis were about.

> [The victim] was seemingly willing to be a bad boy, but couldn't help commenting how small the defendant's penis was using those emojis.  Again, [the victim] couldn't have known anything about this 29-year old man's penis unless [the victim] had seen it.  It is also too suspicious to ignore that reference to a penis being immediately connected to the talk about being a bad boy in the text, right.

[14]  The prosecutor stated,

> There is also some other evidence that we didn't hear any of.  Wouldn't it have been nice to hear from [the doctor Farley said diagnosed his anxiety]?  We have the defendant's words that he has anxiety.  No medical professionals came here and told you about that.  You can have doubt about that because it is not corroborated.  He told you that he had a hearing issue, but he couldn't even name the doctor who diagnosed him with that.  There is no evidence to show he has either of those issues, other than his word, and his word only when it is most convenient for him to bring it, right, he didn't mention any of that to [the detective].  He didn't mention any of that on the stand — or until he came on to the stand here.

memory of what transpired that controls."[15] The prosecutor then stated to the jury that Farley's aunt had testified that Farley "had a hearing problem, but you know what, my mom thinks I am handsome, that doesn't really carry a lot of weight." The prosecutor later commented on Farley's "throwing every excuse against the wall" and indicated that this was "not the [h]allmark of truth."[16] Farley did not object.

[¶19] The jury returned a verdict of guilty on both counts. Farley was sentenced to twenty-three years of imprisonment on Count 1 and ten years of imprisonment on Count 2, to be served concurrently with Count 1. The court also imposed lifetime supervised release.[17] Farley timely appealed. *See* 15 M.R.S. § 2115 (2024); M.R. App. P. 2B(b)(1).

---

[15] The court also stated, "So if your memory is different from that of the attorneys, then your collective memory is the one that you should follow." The court later instructed the jury, after the prosecutor had concluded his rebuttal, that "[t]he attorneys have just presented to you their evidence and have explained . . . how they believe you should view the evidence . . . ." The court also instructed the jury, "You are the only ones that can decide what the evidence shows." Prior to closing argument, the court had instructed the jury that the arguments were not evidence and that if the jury's recollection of the evidence differed from what counsel relayed in closing argument, the jury should rely on its recollection of the evidence. During its general instructions, the court again stated that the attorneys' closing arguments were not evidence and that the jury's memory of the evidence controlled over the attorneys' arguments.

[16] The prosecutor argued to the jury that "some of this talk about the hearing, or was it the anxiety, they are just throwing every excuse against the wall. It sounds like a kid, right, the dog ate my homework, and my alarm didn't work, and I was late for the bus, like just throw it all at the wall and see what sticks. That is not the [h]allmark of truth."

[17] Farley does not challenge the sufficiency of the evidence on appeal. Nevertheless, viewing the evidence in the light most favorable to the State, we determine that the jury "rationally could find

## II.  DISCUSSION

### A.    Suppression Issues[18]

### 1.    Custodial Interrogation Determination

[¶20]  Farley contends that the court should have excluded the recorded interview with the detective because, given the totality of factors, Farley was in custody during the interview.  Farley points out that, inter alia, he was the only suspect under investigation; he was in a closely-confined police vehicle; and the detective was armed, persistent in his questioning, and implied that Farley would "receive favor for disclosing information."

---

beyond a reasonable doubt every element" of the charged offenses.  *State v. Dorweiler*, 2016 ME 73, ¶ 6, 143 A.3d 114 (quotation marks omitted).

[18]  Farley's motions to suppress raised two arguments: (1) Farley's interview with the detective was custodial and thus required a warning, before questioning, that Farley was free to remain silent and (2) Farley's statements were involuntary.  As to the first argument, Farley has not developed a claim under the Maine Constitution, and so we review his claim under only federal law.  *See State v. Tripp*, 2024 ME 12, ¶ 20 n.9, 314 A.3d 101.

As to the second argument, we have previously explained in some detail how we review whether a statement is involuntary under article I, section 6 and article I, section 6-A of the Maine Constitution, and how that review is more expansive than the review given under the federal constitutional counterparts to these state constitutional provisions.  *See, e.g.*, *State v. Caouette*, 446 A.2d 1120, 1122-24 (Me. 1982); *see also State v. Athayde*, 2022 ME 41, ¶ 23, 277 A.3d 387.  We therefore review Farley's claim under the Maine Constitution.  Because, as explained *infra*, that claim fails under the Maine Constitution, it also fails under the Fifth Amendment and Due Process Clause of the United States Constitution.  *See Athayde*, 2022 ME 41, ¶ 39, 277 A.3d 387.  *See generally State v. Norris*, 2023 ME 60, ¶ 34, 302 A.3d 1 (noting that "[w]hat is required to preserve a state constitutional claim will vary by context" and that less development is required "when we have already explained in some depth the scope of the state constitutional provision at issue").

[¶21]  "When addressing a challenge to a court's denial of a motion to suppress, we review the motion court's factual findings for clear error and its legal conclusions de novo."  *State v. Perry*, 2017 ME 74, ¶ 14, 159 A.3d 840. "A *Miranda* warning is necessary only if a defendant is: (1) in custody; and (2) subject to interrogation."[19]  *State v. Dion*, 2007 ME 87, ¶ 21, 928 A.2d 746 (alteration and quotation marks omitted).  "We treat the determination of whether a person was in custody for *Miranda* purposes as a mixed question of law and fact."  *Perry*, 2017 ME 74, ¶ 14, 159 A.3d 840; *see also Ames*, 2017 ME 27, ¶ 11, 155 A.3d 881 (explaining that if a ruling is "based primarily on undisputed facts," we will view that ruling de novo as a legal conclusion and "will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision" (quotation marks omitted)); *State v. Glenn*, 2021 ME 7, ¶ 21, 244 A.3d 1023 (stating that we "will not reverse a trial court's custodial determination unless the record fails to rationally support the finding" (quotation marks omitted)).

[¶22]  To determine whether a person was in custody, "a court must objectively review the pertinent circumstances to decide whether a reasonable person in the defendant's position would have felt free to terminate the

---

[19]  The State concedes that Farley was subject to interrogation.

interaction with law enforcement or if there was a restraint on freedom of movement of the degree associated with formal arrest." *Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840 (quotation marks omitted). "[A] court may consider a number of factors" in this analysis.[20] *Id.*

[¶23] The court did not err in concluding that Farley was not in custody. The court's factual findings are all supported by competent evidence. Although there are some factors that could support a conclusion that Farley was in custody, only a single detective interviewed Farley; the interview occurred mid-afternoon, in an unmarked cruiser parked within yards of Farley's home; Farley was not physically restrained; Farley was told he could leave at any time and did not have to talk to the detective; Farley never asked to stop the interview; and the interview was conversational and under an hour long. *See State v. Williams*, 2011 ME 36, ¶¶ 2, 8, 15 A.3d 753.

---

[20] Those factors include "(1) the locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant); (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation." *State v. Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840 (quoting *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222); *see also State v. Dion*, 2007 ME 87, ¶ 23, 928 A.2d 746 (explaining that the factors "are viewed in their totality, not in isolation").

[¶24] Therefore, given the totality of the circumstances, the court did not err. *See, e.g.*, *State v. Bryant*, 2014 ME 94, ¶¶ 3-4, 11-14, 97 A.3d 595 (concluding that the defendant was not in custody during an interview in a police cruiser located "immediately outside" the defendant's residence); *Perry*, 2017 ME 74, ¶ 16, 159 A.3d 840; *Ames*, 2017 ME 27, ¶¶ 3-6, 14-15, 22, 155 A.3d 881; *Dion*, 2007 ME 87, ¶¶ 3-13, 16, 20, 24-30, 928 A.2d 746; *State v. Higgins*, 2002 ME 77, ¶¶ 5-8, 14-18, 796 A.2d 50.

### 2. Voluntariness Determination

[¶25] Farley contends that the objective conditions of the interview, "and the subjective emotional agitation coursing through [him] as he was confronted with serious allegations, give[] rise to a finding of involuntariness in the statements."

[¶26] "We review the trial court's factual findings regarding voluntariness for clear error and its ultimate determination regarding voluntariness de novo." *Glenn*, 2021 ME 7, ¶¶ 25, 28-29, 244 A.3d 1023 (quotation marks omitted) (explaining that because "the test is essentially a factual one . . . we defer to the trial court's findings in the absence of clear error"). "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the

circumstances its admission would be fundamentally fair." *State v. Seamon*, 2017 ME 123, ¶ 18, 165 A.3d 342 (quotation marks omitted).

[¶27] "The suppression judge must consider the totality of the circumstances in determining whether a confession is voluntary." *Dion*, 2007 ME 87, ¶¶ 32, 35, 928 A.2d 746 (quotation marks omitted) (explaining that the factors supporting a determination that a defendant was not in custody can also support a conclusion that the defendant's statements were voluntary). The determination depends on "the details of the interrogation; [the] duration of the interrogation; [the] location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; [any] police trickery; [any] threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct." *Glenn*, 2021 ME 7, ¶ 26, 244 A.3d 1023 (quotation marks omitted); *see also State v. Annis*, 2018 ME 15, ¶¶ 14-15, 178 A.3d 467 ("[N]either a law enforcement officer's generalized and vague suggestions that telling the truth will be helpful to a defendant in the long run, nor mere admonitions or exhortations to tell the

truth, will factor significantly into the totality of the circumstances analysis." (quotation marks omitted)).[21]

[¶28] Competent evidence supports the court's factual findings regarding voluntariness. The court "properly concluded that those facts establish a voluntary confession," and we affirm the court's denial of Farley's motions to suppress. *Dion*, 2007 ME 87, ¶ 35, 928 A.2d 746 (determining that the defendant's statements were voluntary where there was no physical force, "[t]he interview was conversational and cooperative, and the officers remained calm and polite"); *Seamon*, 2017 ME 123, ¶¶ 3-7, 19-22, 165 A.3d 342; *see also Annis*, 2018 ME 15, ¶¶ 14-15, 16 & n.3, 178 A.3d 467 (explaining that "[t]he suppression record here is devoid of any testimony concerning how [the defendant's] claimed psychiatric disorders may have affected his ability to voluntarily speak with the investigators").

---

[21] Hearing loss was the only basis for Farley's argument, in his motions to suppress, that his statements were involuntary. Farley thus failed to preserve the argument that he asserts on appeal regarding his anxiety causing a lack of voluntariness. *See, e.g.*, *State v. Annis*, 2018 ME 15, ¶ 12 & n.1, 178 A.3d 467 (declining to address an argument regarding "an additional ground for suppression" relating to "cognitive limitations and mental health issues" because "this argument was not raised before the suppression court").

## B.    Prosecutorial Error Issues

### 1.    Prosecutor's Statements About Farley's Hearing Loss and Anxiety

[¶29]  Farley contends that the prosecutor "unfairly mischaracterized the evidence" when the "prosecutor improperly suggested" there was "'no' corroborating evidence" to support Farley's deafness and anxiety.[22]  Farley argues that the court's curative effort after his objection was insufficient because it was a general instruction and the prosecutor's statement immediately thereafter undermined its usefulness,[23] and that the error was not harmless.  The State concedes that the prosecutor made an error in stating that there was no corroboration for Farley's testimony regarding his hearing issues, but it argues that any error was harmless because the prosecutor immediately corrected himself and the court gave a curative instruction, which was also given multiple times throughout the delivery of the jury instructions.

[¶30]  Because Farley objected to the prosecutor's initial statements, "we review the preserved claim of prosecutorial error for harmless error."  *State v.*

---

[22]  Here, as in *State v. Tripp*, 2024 ME 12, ¶ 20 n.9, 314 A.3d 101, Farley is not alleging that the prosecutor's statements were made in bad faith.  Rather, he focuses on the statements' impact on his trial.

[23]  Farley did not object to the prosecutor's statement after the court's instruction.  We thus consider this statement below, *see infra* n.25, but apply an obvious error standard of review, *see State v. Dolloff*, 2012 ME 130, ¶¶ 35-38, 58 A.3d 1032.

*Osborn*, 2023 ME 19, ¶ 21, 290 A.3d 558. "Harmful error is error that affects the criminal defendant's substantial rights, meaning that the error was sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* (quotation marks omitted); *see* M.R.U. Crim. P. 52(a).

[¶31] "We analyze claims of prosecutorial error in the overall context of the trial." *Osborn*, 2023 ME 19, ¶ 22, 290 A.3d 558 (quotation marks omitted); *see also State v. Dolloff*, 2012 ME 130, ¶¶ 32-34, 58 A.3d 1032 (describing factors that we consider in determining the effect of an error). "[W]e generally defer to the determination of the trial judge, who has the immediate feel of what is transpiring, that a curative instruction will adequately protect against the jury's consideration of a misstatement by the prosecutor." *State v. Bethea*, 2019 ME 169, ¶ 26, 221 A.3d 563 (quotation marks omitted). "Only where there are exceptionally prejudicial circumstances or prosecutorial bad faith will a curative instruction be deemed inadequate to eliminate prejudice." *Id.* (quotation marks omitted).

[¶32] Here, the conceded error was harmless. The prosecutor initially stated that there was "no evidence to show [Farley] has either [anxiety or a hearing issue], other than his word." This was untrue with respect to Farley's

hearing,[24] because Farley's aunt had testified that Farley had problems with hearing. The court, however, gave a curative instruction to the jury, *see supra* ¶ 18 & n.15, indicating, inter alia, that "the attorneys are free to argue . . . what there is or isn't for evidence, but it is your memory of what transpired that controls." *See Bethea*, 2019 ME 169, ¶ 27, 221 A.3d 563 (stating that we presume that the jury follows the court's instruction regarding "the jury's responsibility to rely on its own recollection of the evidence").

[¶33] The court had given a similar instruction prior to the start of closing argument and gave a similar instruction after closing argument. *See Osborn*, 2023 ME 19, ¶ 25, 290 A.3d 558. Further, after the court's curative instruction, the prosecutor acknowledged that Farley's aunt had "said that [Farley] had a hearing problem." *Cf. Dolloff*, 2012 ME 130, ¶¶ 54-55, 58 A.3d 1032 (determining the court's multiple instructions "were sufficient to remedy any prejudice" even though the prosecutor continued to make improper statements after the defense counsel's objection and the court's first curative instruction). Thus, we determine that any error did not affect Farley's substantial rights.

---

[24] Regarding Farley's anxiety, the prosecutor was correct that there had been no evidence offered at trial other than Farley's testimony.

## 2.  Prosecutor's Statements Regarding the Emojis

[¶34]   Farley argues that the "prosecutor improperly proffered an unsupported conclusion about the 'emoji' text message (sent by [the victim]) having sexual connotations, despite such a conclusion being directly opposite to the testimonial evidence at trial," and that this prejudiced his substantial rights to a fair trial.

[¶35]   Because Farley did not object to the prosecutor's statements at trial, our review is for obvious error. *See id.* ¶¶ 35-38. "To demonstrate obvious error, the defendant must show that there is (1) an error, (2) that is plain, and (3) that affects substantial rights."  *Id.* ¶ 35 (quotation marks omitted); *see* M.R.U. Crim. P. 52(b).  "Even if these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings."  *Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032 (quotation marks omitted).

[¶36]  Prosecutors should avoid "[m]isrepresenting material facts in the record or making statements of material fact unsupported by any evidence." *Id.* ¶ 42.  In determining whether the prosecutor erred, the issue is "whether the prosecutor's comment is fairly based on the facts in evidence."  *State v. Cote*, 2017 ME 73, ¶ 26, 159 A.3d 831 (quotation marks omitted).  We have, however,

consistently "upheld the prosecutor's ability to argue vigorously for any position, conclusion, or inference supported by the evidence." *Id.* (quotation marks omitted).

[¶37] Here, there was no obvious error. Although Farley is correct that the victim testified that the messages reflected a joke, exhibits containing the messages and emojis were admitted in evidence, the victim and detective both testified that the eggplant emoji meant a penis, and the detective also testified that he initially thought the messages indicated that Farley and the victim "were talking about a sexual exchange." *Cf. Dolloff*, 2012 ME 130, ¶¶ 54-55, 58 A.3d 1032 (concluding the prosecutor made multiple improper statements that could "be seen as the prosecutor's belief as to what a dog might have been thinking" and were "not based on evidence"). The prosecutor did not err in inferring from this testimony and from the exhibits that the messages had a sexual connotation, despite the testimony to the contrary that the messages did not mean this. *See Cote*, 2017 ME 73, ¶ 27, 159 A.3d 831 (explaining that although the defendant "denied stomping on the victim's head, the State's attorney was free to argue to the jury that, based on the evidence presented, it could arrive at the opposite conclusion"); *State v. Gould*, 2012 ME 60, ¶¶ 19-21, 43 A.3d 952.

### 3.    Prosecutor's Statements Regarding Credibility

[¶38]  Farley contends that the prosecutor improperly commented regarding the victim's truthfulness and Farley's dishonesty and that the statements were obvious error.[25]  The State concedes that one of the prosecutor's statements regarding the victim may have been in error,[26] but it argues, inter alia, that when read in context, the statements related to how to evaluate the witness's credibility and that even the potentially problematic statement was not a plain error.

[¶39]  "The role of a prosecutor in the courtroom is unique, serving as a minister of justice who is obligated to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient

---

[25]  As mentioned above, *see supra* ¶ 29 & n.23, Farley also takes issue with the prosecutor's comment about Farley's aunt's testimony, a comment which the prosecutor made after the court's instruction.  Farley contends that the prosecutor's comment regarding Farley's aunt's testimony "injected [the prosecutor's] opinion about credibility of the aunt's testimony."  Because Farley did not object after the prosecutor's statement, we review for obvious error.  *See Dolloff*, 2012 ME 130, ¶¶ 35-38, 58 A.3d 1032.  The prosecutor stated, "So we did hear from his aunt, and she said that he had a hearing problem, but you know what, my mom thinks I am handsome, that doesn't really carry a lot of weight."  The court did not commit obvious error in allowing this statement, given the brief nature of the prosecutor's comment; the court's curative instruction, which was given to the jury immediately prior to the prosecutor's statement and which was repeated in the court's closing instructions; and the fact that the prosecutor's statement suggested that the jury should consider the weight to give the aunt's testimony in light of her relationship to Farley, and did not directly state that the aunt was untruthful or not credible.  *See, e.g.*, *id.* ¶¶ 59-60; *State v. Clark*, 2008 ME 136, ¶ 15, 954 A.2d 1066.

[26]  Specifically, the State identifies the prosecutor's statement that the victim "has been forthright and maintained the truth."

evidence." *State v. Hanscom*, 2016 ME 184, ¶ 18, 152 A.3d 632 (quotation marks omitted). "[T]he use of the authority or prestige of the prosecutor's office to shore up the credibility of a witness, sometimes called 'vouching,' constitutes prosecutorial error." *Osborn*, 2023 ME 19, ¶ 23, 290 A.3d 558 (quotation marks omitted); *see also Dolloff*, 2012 ME 130, ¶ 42, 58 A.3d 1032 (listing, as a type of statement that is almost always error, "[i]njecting personal opinion regarding the guilt or credibility of the accused or other witnesses"); *Hanscom*, 2016 ME 184, ¶ 20, 152 A.3d 632 ("It is improper . . . for a prosecutor to vouch for a witness by . . . implying that the jury should credit the prosecution's evidence simply because the government can be trusted." (alteration and quotation marks omitted)). However, "a prosecutor may attack credibility by analyzing the evidence and highlighting absurdities or discrepancies in a witness's testimony." *State v. Schmidt*, 2008 ME 151, ¶ 17, 957 A.2d 80 (quotation marks omitted).

[¶40] Because Farley did not object to any of the prosecutor's statements regarding credibility, we review the court's allowance of those statements for obvious error. *See Dolloff*, 2012 ME 130, ¶¶ 35-38, 58 A.3d 1032. Even when the prosecutor has committed an error, it is not obvious error unless it is "plain." *Id.* ¶ 35. "An error is plain" if it "is so clear under current law, that the

trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *Id.* ¶ 36 (alteration, quotation marks, and citation omitted). To constitute obvious error, the error must also have affected the defendant's substantial rights by being "sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* ¶ 37 (quotation marks omitted). "When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." *Id.* ¶ 38. "We will first review instances of alleged prosecutorial error to determine whether error occurred, and, if there was error, we will then review the State's comments as a whole, examining the incidents of error both alone and cumulatively." *State v. Warner*, 2023 ME 55, ¶ 14, 301 A.3d 763 (quotation marks omitted).

[¶41] Despite the conceded prosecutorial error, the court did not commit obvious error. The prosecutor contended during closing argument that, inter alia, the victim's "testimony had all of the hallmarks of truth" and that the victim "was forthright" and "has been forthright and maintained the truth." Although the prosecutor should have omitted these references to the truth, the prosecutor made the statements in the context of discussing jury instructions

and methods that the jury could use to evaluate the victim's credibility based on the way the victim testified. The prosecutor argued, for example, that the victim answered all questions directly, despite the difficult nature of the testimony; that there was no evidence of equivocation in the victim's account of the events; that there was no evidence of the victim making statements inconsistent with the victim's testimony; and that the evidence corroborated the victim's testimony. *See State v. Comer*, 644 A.2d 7, 8-10 (Me. 1994); *State v. Moontri*, 649 A.2d 315, 316-17 (Me. 1994) (determining that there was no obvious error because the prosecutor's comment, regarding the version of events testified to by the defendant's friend, was "based on the evidence"); *see also State v. Fahnley*, 2015 ME 82, ¶ 40, 119 A.3d 727 (concluding that although the prosecutor's statement in closing argument that the victim's "testimony was very strong" could "constitute vouching, the error is not plain" (quotation marks omitted)). Further, the prosecutor did not convey a personal opinion of the victim's credibility. *See* M.R. Prof. Conduct 3.4(e); *Schmidt*, 2008 ME 151, ¶¶ 17-18, 957 A.2d 80; *cf. Hanscom*, 2016 ME 184, ¶¶ 17-21, 152 A.3d 632 (determining that the prosecutor had impermissibly vouched for the credibility of two child witnesses, including by arguing that "[t]hey were

specific, they were detailed, and *I would submit to you* they were genuine in their testimony" (emphasis added) (quotation marks omitted)).

[¶42]  In his rebuttal, the prosecutor argued that Farley's "talk about the hearing, or was it the anxiety," was "just throwing every excuse against the wall" and "not the [h]allmark of truth."  This argument was grounded in the evidence that the defense offered, evidence which was discussed in the defense counsel's closing argument, and the argument was made in the larger context of the prosecutor's earlier arguments about the jury's evaluation of a witness's credibility—here, Farley's credibility—given the evidence.  *See Comer*, 644 A.2d at 9 ("Although unable to assert personal opinion, a prosecutor may attack credibility by analyzing the evidence and highlighting absurdities or discrepancies in a witness's testimony."); *Warner*, 2023 ME 55, ¶ 14, 301 A.3d 763 (explaining that analyzing incidents of alleged prosecutorial error "includes taking into account the statements, comments, and strategy of the defense, especially when the prosecutor's statements are made in response to the theory, argument, or provocation of the defendant or defense counsel" (quotation marks omitted)); *cf. State v. Tripp*, 634 A.2d 1318, 1319-21 (Me. 1994) (determining there was obvious error where the prosecutor, in addition to improperly cross-examining the defendant, argued that the victim

"told you the truth" and that either the victim or defendant "was lying here to all of us" and explaining that "[t]he clear implication is that the prosecutor believed that the victim told the truth but defendant lied" (quotation marks omitted)).

[¶43]  The case against Farley did center on the credibility of the victim and on the credibility of Farley, whose testimony disputed the victim's account. However, the jury also had before it the admitted recording of Farley's interview and his own admissions to having engaged in sexual acts with the victim and having the victim touch Farley's genitals. *Cf. State v. Tripp*, 634 A.2d 1318, 1319-21 (Me. 1994) (determining the prosecutor's statements in closing argument constituted obvious error in part because it was a "close case," where "[o]ther than the testimony of the victim, there was no direct evidence of guilt and limited circumstantial evidence").  Further, the prosecutor's statements were isolated.  *Cf. State v. Clark*, 2008 ME 136, ¶¶ 6-7, 11-14, 954 A.2d 1066 (determining there was not obvious error, considering the context of the record in the case, where the prosecutor argued in four instances that the defendant lied to the jury during the defendant's testimony).

[¶44]  Finally, the court later instructed the jury that it could "consider whether the witness was forthright or evasive" and that "[t]he attorneys have

every right to argue with respect to the facts and the credibility of witnesses, however, you [the jurors] are to make your own decisions as to credibility, and you make your own decisions as to the facts." *See Fahnley*, 2015 ME 82, ¶ 40, 119 A.3d 727 (explaining that "given the court's instructions regarding the jury's role in determining the facts," any error relating to the prosecutor arguing that the victim's "testimony was very strong" did not affect the defendant's substantial rights (quotation marks omitted)).

[¶45] The court's allowance of the prosecutor's statements regarding credibility, even when those statements are considered cumulatively, *see Dolloff*, 2012 ME 130, ¶ 74, 58 A.3d 1032, was not obvious error, *see Comer*, 644 A.2d at 8-10 (concluding that there was not obvious error and stating that it was "reasonable to assume that the jury was not induced to focus on anything other than the evidence").

The entry is:

Judgment affirmed.

Stephen C. Smith, Esq., and Carl E. Woock, Esq. (orally), Steve Smith Trial Lawyers, Augusta, for appellant Corey W. Farley

Maeghan Maloney, District Attorney, and Frayla Tarpinian, Dep. Dist. Atty. (orally), Prosecutorial District IV, Skowhegan, for appellee State of Maine

Somerset County Unified Criminal Docket docket number CR-2021-821
FOR CLERK REFERENCE ONLY